[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1180 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1181 
The appellant, Roland Vaughn,* was indicted for theft of property in the first degree, a violation of §§ 13A-8-2(2) and13A-8-3(a), Ala. Code 1975, and for failing to disclose a conflict of interest, a violation of § 13A-10-62, Ala. Code 1975. A jury convicted him of failing to disclose a conflict of interest and acquitted him of theft of property. He was sentenced to 12 months' imprisonment; the sentence was suspended, and he was placed on probation for 12 months.
The evidence adduced at trial indicated the following. In the early 1990s, Tom Brantley, a real estate broker for Haardt Properties, Inc., a corporation formed in the 1970s to buy, sell, and lease properties owned by the Haardt family, began trying to sell approximately 256 acres of land located on North Ripley Street in Montgomery ("the Ripley Street property") that was owned by Anton Haardt. In 1996, Andrew Nolin,[1] who owned property adjacent to the Ripley Street property, acquired an option on the property, but the sale did not go through. In late 1997 or early 1998, Nolin contacted Brantley. At that time, Nolin was trying to sell his property as well, and he asked Brantley for information regarding the Ripley Street property, including what price Haardt was asking for the property. Nolin thought that by marketing the two properties together he and Brantley might find a buyer for both. Sometime in late 1998 or 1999, Nolin informed him that Roland Vaughn, the president of Sherlock, Smith Adams, an architectural, engineering, and urban planning firm in Montgomery, was involved with some potential buyers of the properties. In May 1999, Nolin informed Brantley that Vaughn was working as an architect for "Life Trust and Jackson Hospital," both of which were interested in purchasing the properties. (R. 109.) Nolin acquired another option on the property in 1999, but again the sale did not go through.
In January 2000, Ralph Tibbs Garver III began working as assistant finance director for the State of Alabama. He had previously worked as a private consultant for Sherlock, Smith 
Adams. As one of his first assignments for the State, Garver began looking at various expenditures by State departments. In February 2000, Garver met with Randall Smith, then director of the Alcohol Beverage Control Board ("ABC Board") and toured the board's warehouse facility. According to Garver, the warehouse was outdated and in poor condition, and in March 2000, he spoke with Henry Mabry, finance director for the State of Alabama, regarding the warehouse. Garver advised Mabry that he believed the State could save a considerable amount of money by building its own warehouse facility rather than leasing *Page 1182 
a facility as it had been doing for a number of years. Mabry instructed Garver to contact Vaughn about performing a comparative site analysis and a cost-benefit analysis of the possibility of the State's purchasing a piece of land and building its own warehouse facility. Vaughn informed Garver that such an analysis would cost $25,000; Mabry approved the study.
In April 2000, discussions began between Vaughn, Garver, and Smith regarding the needs of the ABC Board with respect to the prospective warehouse facility. Initially, the only property considered was a piece of property in east Montgomery owned by the Department of Youth Services ("the DYS property"). However, in May 2000, it became known that Shane Bailey, director of the surplus properties division of the Alabama Department of Economic and Community Affairs ("ADECA"), was also looking for a warehouse facility. The ABC Board and ADECA decided to join their respective projects in an attempt to yield greater savings for the State. When Bailey became interested in the joint project, he suggested a piece of property in west Montgomery ("the west Montgomery property"). Garver testified that in June 2000 Smith indicated that he was not interested in the west Montgomery property and Bailey indicated that he was not interested in the DYS property, and the group began to look for other properties. However, Bailey testified that both he and Smith were interested in the DYS property and that they both thought the DYS property was a good prospect. At a meeting in June 2000, Vaughn suggested the Ripley Street property, which, he told the group, he had been trying to develop with Nolin for some time. According to Bailey, at this meeting, Vaughn showed the group a detailed drawing of a proposed industrial park to be located on the Ripley Street property.[2]
In July 2000, Vaughn contacted Nolin and asked if he still had an option on the Ripley Street property, which he did not. Vaughn told Nolin that he was looking at several pieces of property as possible sites for State warehouses, and he asked Nolin to acquire another option on the property; Nolin agreed to do so. According to Nolin, it is common in commercial land sales for a middleman to purchase the property to keep the price down for the actual buyer — in this case, the State of Alabama. Nolin said that when he asked for the option he mentioned Vaughn's name in order to give the offer more credibility, considering his two unsuccessful attempts to purchase the property. Nolin asked Brantley to meet with Vaughn to discuss some particulars about the possible purchase of the property. Brantley met with Vaughn at Vaughn's office. Brantley testified that he could not remember what was discussed during the meeting. However, following the meeting, Brantley sent Vaughn a letter, dated July 20, 2000, indicating that Haardt had authorized him to sell the Ripley Street property to Vaughn for $500,000. The letter also indicated that, for $10,000, Haardt would agree to a 60-day due-diligence period that could be extended another 60 days for an additional $10,000. On July 24, 2000, Nolin sent Brantley a counteroffer of $300,000 on behalf of him and Vaughn.[3] On July 25, *Page 1183 
2000, Brantley sent a letter to Haardt and one of her attorneys, John Marsiglia; that letter stated, in part:
 "Enclosed is the letter that makes the $300,000 offer in response to your $500,000 price for backland [of the Ripley Street property]. The architect, Roland Vaughn, is doing the plans and survey and he is doing the demographics too, for the user/lessee, a warehouse user.
 "I do not know who the warehouse is for, but Roland Vaughn is actually the buyer. He apparently feels like investing in the land because he has a user for part of it. He will build the warehouses and lease to his tenant and find other uses for the rest of the land eventually.
 "Andrew Nolin is going to be part owner. They will form a [limited liability company] after they get the property under contract (C H Investments, LLC).
They tried to find buyers for the front and back but ultimately it has come down to this."
(C. 386.) (Emphasis added.)
Garver testified that by August 2000, the decision for the State to attempt to purchase the Ripley Street property had essentially been made and all efforts had focused on that property because it was the only property that both Smith and Bailey were interested in.[4] However, Smith testified that, although the group was "beginning to lean toward" the Ripley Street property, the decision to purchase it had not actually been made and the other properties had not been excluded from consideration. (R. 387.) In addition, Bailey testified that it was not until much later, after "the analysis was complete and we were going to compare the three sites and try to make a decision" that the State decided to focus on the Ripley Street property. (R. 364.) Moreover, the record reflects that on August 3, 2000, after Garver said the decision to focus on the Ripley Street property had been made, Vaughn wrote a letter to Garver on behalf of Sherlock, Smith Adams setting forth the cost of his services to evaluate the costs and benefits of building a warehouse facility on three potential sites — the Ripley Street property, the DYS property, and the west Montgomery property.
In August 2000, Brantley sent another letter to Haardt and Marsiglia, informing them that he had spoken with Vaughn and that Vaughn had increased his offer to purchase the property to $375,000, but that Vaughn had also indicated that, although he was offering $375,000, his maximum offer would be $400,000. In addition, in August, Nolin contacted Terry Wilson, a real estate attorney, and requested that he conduct the closing on the Ripley Street property. Wilson testified that, in addition to agreeing to conduct the closing on the property, at the end of August 2000, he drew up the articles of organization for C *Page 1184 H Investments, LLC. Nolin was listed in the articles as the sole owner of C H Investments. On August 25, 2000, C H Investments and Anton Haardt entered into a written sales agreement in which C H Investments agreed to purchase the Ripley Street property for $425,000. The agreement was signed by Andrew Nolin, but Vaughn was listed in the agreement as the person who was to receive all notices sent to the corporation. The sales agreement included a 60-day due-diligence period for which Nolin paid $10,000 out of his personal funds.
Although the articles of organization listed Nolin as the sole owner of C H Investments, Wilson testified that he drew up a "bill of sale" in which Vaughn purchased a 50% ownership in C H Investments. That document, which was introduced into evidence without objection, was not dated. However, Wilson testified that he believed that the bill of sale was executed within "a couple of weeks" of the formation of C H Investments, i.e., sometime in mid-September 2000.[5] (R. 222.) Nolin testified that Vaughn did not acquire ownership in C H Investments until December 2000; however, he also stated that Wilson would know better than he would when the bill of sale was executed. Testimony indicated that the "C" in C H Investments was the first letter in Nolin's middle name and the "H" was the first letter in Vaughn's middle name.
Meanwhile, during August and September 2000, representatives for the ABC Board and ADECA met with the city planner for the City of Montgomery regarding zoning of the Ripley Street property, and hired various firms to do due-diligence studies on the Ripley Street property.[6] Garver testified that in the September 2000 discussions it was determined that the price per acre of the Ripley Street property would be between $2,100 and $2,500. Garver also testified that he knew in September 2000 that Nolin had an option on the property, but that Vaughn had never told him about the existence of C H Investments.
On October 20, 2000, Vaughn submitted a draft of the comparative site analysis to Garver. In the analysis, Vaughn recommended the Ripley Street property and stated that it would cost approximately $537,600, or approximately $2,100 per acre, to purchase the property. The report stated that the property was at that time optioned by Nolin, but it did not mention C H Investments. Also in October 2000, toward the end of the 60-day period in the sales agreement between C H Investments and Haardt, Nolin put up another $10,000 to extend the due-diligence period by an additional 30 days.
Garver testified that in November 2000, Mabry instructed him to determine exactly who owned the Ripley Street property to ensure that there would be "no surprises" to the State. Garver said that he spoke to Vaughn and that Vaughn told him that Haardt owned the property and that it was optioned by Nolin. Again, Vaughn did not mention C H Investments. At the end of November, Garver learned that the State would be unable to finance the project *Page 1185 
and he telephoned Vaughn to inform him of that fact. At that point, Vaughn suggested a bond issue to raise the funds to finance the project. Also in November, the due-diligence extension on the sales agreement between C H Investments and Haardt expired.
In December 2000, the ABC Board and ADECA began discussions with the Montgomery Downtown Redevelopment Authority ("the MDRA") regarding a possible bond issue to fund the State's purchase of the Ripley Street property. Frederick Simpler, Jr., a Montgomery attorney whose practice consists primarily of municipal finance, taxes, and bonds and who was involved in the transaction, testified that the State cannot borrow money in its own name, but that it must use financing vehicles, such as public building authorities, which are authorized by state law to issue bonds to finance new buildings; these authorities can then lease the buildings constructed with the proceeds of the bond issue to the State. The MDRA is one such financing authority. Simpler identified a proposed financing-lease agreement between ADECA and the MDRA for the Ripley Street property. ADECA was to be the lessee and the MDRA the lessor; at the conclusion of the lease, when all the rent payments had been made, the property would automatically be transferred to ADECA.
Sam Dendy, a commercial loan officer for Regions Bank, testified that Vaughn and Nolin took out a $36,000 loan on December 11, 2000. On a "loan memo" Dendy completed when making the loan, he wrote as the reason for the loan "personal investment." (C. 476.) Dendy testified that he was told that the money was to be used to purchase an option on a piece of property. Under the section in the loan memo entitled "Repayment Plan," Dendy wrote: "Sale of land to State of AL." (C. 476.) According to Dendy, he received this information from Vaughn and Nolin, and he understood that Vaughn and Nolin were to repay the loan by selling a piece of land to the State. After taking out the loan, a contract-extension agreement on the Ripley Street property was signed. Pursuant to that agreement, C H Investments would put up another $15,000, the purchase price of the Ripley Street property would increase to $435,000, and the parties would have until January 15, 2001, to close on the property. On December 12, 2000, Sherlock, Smith Adams sent an invoice in the amount of $25,000 to the State for the comparative site analysis. On December 15, 2000, Vaughn submitted the final analysis to Garver; it was substantially the same as the October 20, 2000, draft.
The final analysis was submitted to the Governor's office and, in January 2001, then Governor Don Siegelman approved the property and the proposed bond issue by the MDRA. G.H. Construction Company was to be the project manager, and all bills and invoices associated with the project were to be submitted to and paid by G.H. Construction. G.H. Construction would be reimbursed with the money from the bond issue, which was to be in the amount of $20,700,000. In mid-January 2001, G.H. Construction paid $25,000 to extend the sales agreement between C H Investments and Haardt to February 9, 2001.
In February 2001, G.H. Construction submitted an invoice to the State requesting payment of $330,258 for various expenditures associated with the project, including the $25,000 owed to Sherlock, Smith Adams for the analysis. The State paid G.H. Construction on February 8, 2001; G.H. Construction then paid Sherlock, Smith Adams $25,000 on February 14, 2001. *Page 1186 
On February 9, 2001, the purchase of the Ripley Street property was completed. C H Investments purchased the property for $460,000, or approximately $1,800 per acre. That same day, C H Investments sold the property to G.H. Construction for $561,000, or approximately $2,191 per acre. Vaughn made a net profit of approximately $48,000 on the transactions.
William J. Long, a special agent with the Alabama attorney general's office, testified that in the spring of 2001 he was asked to investigate the warehouse project, after an article in the Mobile Press Register alleged irregularities regarding invoices submitted to the State as part of the project.
During Long's investigation, he interviewed Vaughn twice and spoke with him once by telephone. The first interview, on May 16, 2001, was mainly to obtain background information regarding the project and Vaughn's involvement in it. Vaughn told Long that he was the president of Sherlock, Smith Adams, and that he had been contacted by Garver to conduct a site analysis regarding the warehouse project. Vaughn said that the analysis was conducted during the summer and fall of 2000 and that Sherlock, Smith 
Adams had been paid $25,000 for conducting the analysis. Long testified that during the interview, Vaughn told him that "he had been contacted by Ran Garver and told that he had been informed by Henry Mabry the State of Alabama could not afford to go forward with the project at that time," and that Vaughn told Garver that there were possible alternatives and not to abandon the project. Long identified the "Standard Form of Agreement Between Owner and Architect with Standard Form of Architect's Services" that he had received from Vaughn as part of his investigation. The form indicated that had the State's warehouse project been completed, Sherlock, Smith Adams would be paid approximately $850,000 for its architectural services in designing the warehouse facility. According to Long, Vaughn, during the May interview, never mentioned C H Investments and never mentioned that he had been involved in the purchase and sale of the Ripley Street property.
After the May interview, Long received several documents from Terry Wilson relating to the closing on the property, including a check dated February 9, 2001, made payable to Vaughn for approximately $48,000. On August 2, 2001, Long telephoned Vaughn and asked him about the check. Long testified regarding that conversation as follows:
 "Well, after asking him to give me an explanation about the check, he told me that he and Andrew Nolin had been involved in an arrangement with regard to the 256 acres of land, that Andrew Nolin had acquired one or two options on that property, that Mr. Nolin had reached the point that he was not willing to acquire any further options because the money that he had on the options would be at risk. He further told me that Mr. Nolin asked him if he would be willing — if Mr. Vaughn would be willing to co-sign a note at Regions bank and assume some of the risk with regard to the options.
". . . .
 "He said he agreed to do it and that he did, in fact, go with Mr. Nolin and obtain a loan at Regions bank in the amount of approximately $36,000 which was used towards the options. At about this point during the telephone conversation, I asked Mr. Vaughn why he had not disclosed that information to me in the previous interview. He said, I didn't think I had any responsibility to tell you that because the State was not affected by what I did.
". . . . *Page 1187 
 "We continued our conversation, and he told me that he had, in fact, obtained a 50 percent ownership in C H Investments, and that C H Investments involved Andrew Nolin as well as the defendant. At about this point in the telephone conversation, I simply said, do you have anything else you need to tell me about your involvement in that transaction? At that point, he said that he and Nolin had attempted or had been involved in getting rights-of-way — right-of-ways to that property in order to have an access to the property."
(R. 459-60.)
On September 12, 2001, Long interviewed Vaughn again. He testified about that interview as follows:
"[Prosecutor]: How did that interview begin?
 "[Long]: I asked him to explain his investment with Andrew Nolin and C H Investments. He told me that he had been involved with Mr. Nolin for about two or two and a half years with regard to the . . . Ripley Street property and that he had tried to market that property in those two to two and a half years unsuccessfully, that he had tried to market it to Jackson Hospital, and that he had tried to market that property to ALFA Insurance.
 "[Prosecutor]: Did you ask Mr. Vaughn about whether he ever recommended the North Ripley Street site to the State?
 "[Long]: We discussed that and he said he did recommend the property to the State.
 "[Prosecutor]: Did you talk about the draft report and the final report that was submitted?
 "[Long]: He explained to me that Sherlock, Smith 
Adams submitted a draft report to the State of Alabama that was dated October 20, 2000, and that following the draft report, a final report was submitted to the State of Alabama dated December 15, 2000, and it was on the final report that Sherlock, Smith Adams submitted their invoice for payment.
 "[Prosecutor]: Did you ask him if there were any differences between the final report and the draft report?
 "[Long]: Yes, I did. And he said that there were no changes of any significance.
 "[Prosecutor]: Did he state or did you ask him why the final report was submitted?
 "[Long]: Yes, I did. He told me that in order to invoice the State, the final report had to be submitted, that Sherlock, Smith Adams would not have invoiced on a draft.
 "[Prosecutor]: You mentioned previously you discussed during this interview C H Investments and its involvement with Andrew Nolin. Did you ask him when C H Investments was formed?
"[Long]: I did.
"[Prosecutor]: What did he say?
 "[Long]: He said that C H was formed simultaneously with the loan they acquired on December 11 at Regions Bank.
 "[Prosecutor]: Did you ask him what the `C' and what the `H' stood for?
 "[Long]: I did. He told me he wasn't sure of what the `C' stood for, but the `H' stood for his middle initial, that he had told Andrew Nolin to use his middle initial when they formed C H Investments, and that he had used his middle initial `H' in previous real estate transactions.
 "[Prosecutor]: Did you ask the defendant whether anyone in his firm, Sherlock, *Page 1188 
Smith Adams, knew about his ownership of C H Investments or his interest in the . . . Ripley Street property?
 "[Long]: Yes, I did. He told me there were only three people that knew of his financial involvement in the . . . Ripley Street property. He said that Terry Wilson, the attorney who handled the closing, knew about it, Andrew Nolin knew about it, and the banker at Regions Mortgage, Sam Dendy, knew about it. He said no one in his office knew that he had a financial interest or any interest in that . . . Ripley Street property.
 "[Prosecutor]: Did you ask the defendant if he felt a responsibility to disclose his interest in the property in C H Investments to the State?
"[Long]: Yes, I did.
"[Prosecutor]: What did he say?
 "[Long]: I asked him that a number of times during the interview, during the two interviews. Over the telephone he told me he didn't feel as though he had any responsibility to tell the State, that it wasn't affecting the State in what they were doing. During the subsequent interview when I asked him face to face, he told me at the time he made his recommendation to the State, that the State had already decided to move to that property. There were a number of different answers that he gave to it —
". . . .
"[Prosecutor]: What else did he say about it?
 "[Long]: He told me that he didn't gain ownership interest to the property until about the time they acquired the loan at Regions Bank, which was on December 11, and that at the time he gained ownership interest, the State had already made up their mind and had decided to purchase that property.
". . . .
 "[Prosecutor]: When you first spoke with the defendant regarding this investigation, did he tell you that he had made money on the sale of that land?
"[Long]: No."
(R. 461-66.)
On his own behalf, Vaughn testified that he was first approached by Garver in March 2000 about the warehouse project and was asked to do a comparative site analysis. Vaughn told Garver that Sherlock, Smith Adams would charge $25,000 for the analysis. From April through August, Vaughn said, he had various meetings with the ABC Board and ADECA to analyze various sites. He said that during those brainstorming meetings, approximately five different sites in and around Montgomery were discussed. In June, Vaughn said, the focus was narrowed to three sites — the west Montgomery property, the DYS property, and the Ripley Street property — and he hired Ron Blount to help him do the comparative analysis on the three sites.
Vaughn said that in late June or early July the group began focusing on the Ripley Street property because "it offered the greatest opportunity to the State as far as savings, and it offered the greatest potential for the City of Montgomery." (R. 608.) Vaughn testified that, after the focus narrowed to the Ripley Street property, Garver asked him to attempt to get an option on the property, and he and Garver discussed using Nolin as a middleman to secure the option so the owner of the property would not know that the State was the actual buyer. In July 2000, Vaughn contacted Nolin and asked him to attempt to secure an option on the property. In mid-July, Vaughn said, Nolin telephoned him and told him that the Haardt family was reluctant to give him an option *Page 1189 
because he had been unsuccessful in the past on previous options; Nolin asked Vaughn to speak with Brantley in order to assure him that the deal was real. Vaughn said that he met with Brantley on July 21, 2000, and told Brantley that he had a "user" who had an interest in a warehouse facility for the property. (R. 610.) Vaughn denied telling Brantley that he was the buyer of the property, and he said that, at that time, he had no intention of acquiring any kind of interest in the property. On July 28, 2000, Vaughn said, he met with Garver and the others to discuss the three sites; at that time, Vaughn said, he was told to proceed with the Ripley Street property and to have Nolin acquire an option on the property. According to Vaughn, the group had decided at that point to pursue the Ripley Street property and not the other sites. After Nolin, through C H Investments, had entered into the sales agreement for the purchase of the Ripley Street property, Vaughn said, the State began its due-diligence efforts — hiring various firms to do various surveys. According to Vaughn, by August, the work he had been hired to do was completed, except for the actual written report.
Toward the end of the first 60-day due-diligence period, Vaughn said, he spoke with Garver and everything appeared very positive and the State was still planning to purchase the property. Vaughn then relayed that information to Nolin and asked him to get an extension on the due-diligence period past the 60 days, which was to expire on October 24, 2000. Nolin put up another $10,000 and got a 30-day extension of the due-diligence period. Vaughn said Sherlock, Smith Adams submitted its preliminary report on the site analysis on October 20, 2000. According to Vaughn, based on the discussions the previous months, he had no choice but to recommend the Ripley Street property in the report. He also said, however, that the recommendation was the result of "a consensus of the agencies and our input." (R. 650.) As of the date of the preliminary report, Vaughn said, he was entitled to be paid for his work, even though the final report was not submitted to the State until December 15, 2000. In late October or early November, Vaughn said, Garver telephoned him and told him that the project was dead because the State did not have the finances to purchase the property. Vaughn, however, told Garver not to worry, and suggested using the MDRA to purchase the land. This, Vaughn said, was not a part of his contract with the State, which, he said, had already been completed, but was something entirely different; he said he continued to help with the project because he did not want to lose all the "goodwill work" he had put into the project. (R. 643.) Vaughn said that he instructed his billing department on November 17, 2000, to invoice the State for the analysis, but that the bill did not go out until December 12, 2000, as part of the normal monthly billing cycle.
Vaughn testified that on November 7, 2000, he met with Lanny Young, a developer, to discuss a possible bond issue to finance the project. At this point, Vaughn said, $20,000 of Nolin's personal money had been fronted for the due-diligence period and its extensions, and the extension was set to expire on November 23, 2000, so the sale had to be completed by December 15, 2000. On December 5, 2000, Young informed Vaughn that he was interested in being the developer on the project through the MDRA. On December 7, after the extension had expired, Vaughn said, Young met with the group of people who had been involved in the project all along and informed them that, under this approach, everyone involved would actually work for the developer, G.H. Construction, and that *Page 1190 
all invoices, bills, etc., should be sent to the developer. Vaughn testified that when he was informed by Young that all bills should be sent to G.H. Construction, he then had another bill for his services sent there. Both the bill sent to the State and the bill sent to G.H. Construction were dated December 12, 2000, and both bore the same invoice number. According to Vaughn, G.H. Construction paid the $25,000 on February 14, 2001.
Vaughn said that he then contacted Nolin and told him that Young was joining the project as the developer and instructed him to extend the sales agreement; Nolin refused, indicating that he was unwilling to continue because he had already invested $20,000 of his personal funds. Vaughn testified that he then offered to become Nolin's partner and to assume 50% of the liability. On December 11, 2000, Vaughn said, he and Nolin took out a loan, and he also purchased 50% ownership of C H Investments; on December 14, 2000, they secured an extension of the sales agreement until January 15, 2001, for $15,000. Before December 11, Vaughn said, he had no ownership in C H Investments.
On January 15, 2001, Vaughn said, the sales agreement would have expired. This time, G.H. Construction put up $25,000 to extend the sales agreement to February 9, 2001. C H Investments then closed on the property on February 9, 2001, and sold the property to G.H. Construction that same day. Vaughn admitted that he made a profit on the transactions, and said that he believed he was entitled to do so because, he said, "I had kept the project alive when it was about to die." (R. 669.) However, Vaughn denied that he had any conflict of interest that was not disclosed.
 I.
Vaughn contends that the trial court erred in denying his motion to dismiss the indictment because, he says, the indictment was defective. (Issues I and II in Vaughn's brief.) Specifically, Vaughn argues (1) that the indictment failed to allege an essential element of the offense, and (2) that the indictment failed to give him adequate notice of the nature and cause of the charge against him.
The indictment charged Vaughn as follows:
 "The grand jury of said county charge that, before the finding of this indictment, Roland Vaughn, whose name is otherwise unknown to the grand jury, while a public servant, to-wit: a consultant to the Alabama Department of Public Finance in the evaluation and study of viable locations for the Alabama Beverage Control Board Warehouse, did knowingly exercise a substantial discretionary function, to-wit: evaluating three potential sites for development by the State of Alabama, in connection with a governmental contract, purchase, payment, or other pecuniary transaction, to-wit: the purchase of property upon which the said warehouse was to be built, without advance public disclosure of a known potential conflicting interest in the transaction, in violation of Section 13A-10-62 of the Code of Alabama, against the peace and dignity of the State of Alabama."
(C. 7.)
Section 13A-10-62, Ala. Code 1975, provides, in pertinent part:
 "(a) A public servant commits the crime of failing to disclose a conflict of interest if he exercises any substantial discretionary function in connection with a government contract, purchase, payment or other pecuniary transaction without advance public disclosure of a known potential conflicting interest in the transaction. *Page 1191 
 "(b) A `potential conflicting interest' exists, but is not limited to, when the public servant is a director, president, general manager or similar executive officer, or owns directly or indirectly a substantial portion of any non-governmental entity participating in the transaction.
 "(c) Public disclosure includes public announcement or notification to a superior officer or the Attorney General."
We address each of Vaughn's claims in turn.
 A.
First, Vaughn contends that the indictment was defective because it did not allege what he claims is an essential element of the offense — that the compensation paid to him for the comparative site analysis constituted more than 50% of his income. According to Vaughn, the compensation paid to him for the analysis must have constituted more that 50% of his income for him to fall with the definition of "public employee" in §36-25-1(23), Ala. Code 1975,[7] contained within the Code of Ethics, see § 36-25-1 et seq., Ala. Code 1975, which, he says, must be construed in pari materia with § 13A-10-62 because both § 13A-10-62 and the Code of Ethics deal with the same subject matter. According to Vaughn, if the two statutes are construedin pari materia, the definition of "public employee" in §36-25-1(23) "narrows the definition of public servant" as that term is used in § 13A-10-62. (Vaughn's brief at p. 28.) Thus, Vaughn concludes, the term "public servant" as used in §13A-10-62 does not include anyone "whose employment is limited to providing professional services other than lobbying, the compensation for which constitutes less than 50 percent of the part-time employee's income," § 36-25-1(23), and this fact is, therefore, an essential element of the offense of failing to disclose a conflict of interest under § 13A-10-62.
 "`The fundamental rule of statutory construction is to ascertain and give effect to the intent of the legislature in enacting the statute.' IMED Corp. v. Systems Eng'g Assocs. Corp., 602 So.2d 344, 346
(Ala. 1992). In interpreting a statute, `words used in a statute must be given their natural, plain, ordinary, and commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says.' Id.
See also Ex parte Pfizer, Inc., 746 So.2d 960, 964
(Ala. 1999); Blue Cross Blue Shield v. Nielsen, 714 So.2d 293, 296 (Ala. 1998); Tuscaloosa County Comm'n v. Deputy Sheriffs' Ass'n of Tuscaloosa County, 589 So.2d 687, 689 (Ala. 1991); Town of Loxley v. Rosinton Water, Sewer Fire Protection Auth., Inc., 376 So.2d 705, 708 (Ala. 1979). `If the language of [a] statute is unambiguous, then there is no *Page 1192 
room for judicial construction and the clearly expressed intent of the legislature must be given effect.' IMED Corp., 602 So.2d at 346."
Ex parte Cove Props., Inc., 796 So.2d 331, 333-34 (Ala. 2000).
Section 13A-10-60, Ala. Code 1975, provides, in pertinent part:
 "(a) The definitions contained in Section 13A-10-1 are applicable in this article [§§ 13A-10-60, 13A-10-61, 13A-10-62, and 13A-10-63] unless the context otherwise requires.
 "(b) The following definitions also apply to this article:
". . . .
 "(3) Public Servant. As used in this article, such term includes persons who presently occupy the position of a public servant, as defined in Section 13A-10-1(7), or have been elected, appointed or designated to become a public servant although not yet occupying that position."
(Emphasis added.) Section 13A-10-1(7), Ala. Code 1975, defines a "public servant" as "[a]ny officer or employee of government, including legislators and judges and any person or agency participating as an advisor, consultant or otherwise in performing a governmental function."
Sections 13A-10-62, 13A-10-60(b)(3), and 13A-10-1(7) are clear and unambiguous; therefore, no judicial construction is necessary. Section 13A-10-62 governs the conduct of public servants as that term is defined in §§ 13A-10-60(b)(3) and13A-10-1(7). Nothing in § 13A-10-62 suggests, much less requires, that this Court apply a different definition to the term "public servant." See generally Brown v. Board of Educ. of MontgomeryCounty, 863 So.2d 73 (Ala. 2003). Had the Legislature wanted to limit the definition of "public servant" for purposes of §13A-10-62 to only those persons whose compensation constitutes 50% of their income, it could have done so in §§ 13A-10-1(7) and13A-10-60(b)(3); it did not. See, e.g., Noonan v. East-WestBeltline, Inc., 487 So.2d 237, 239 (Ala. 1986) ("It is not proper for a court to read into the statute something which the legislature did not include although it could have easily done so.").
For Vaughn to fall within the definition of a "public servant" for purposes of § 13A-10-62, the compensation paid to him did not have to constitute more than 50% of his income; therefore, that fact was not an element of the offense and did not have to be charged in the indictment. The trial court properly denied Vaughn's motion to dismiss on this ground.
 B.
Vaughn also contends that the indictment was defective because, he says, it failed to provide him with adequate notice of the nature and cause of the accusation against him. Specifically, Vaughn alleges that the indictment "failed to state whether the alleged failure was an act or omission, failed to state the means used to accomplish the act or omission, failed to state which of three potential sites referenced in the indictment supposedly involved some conflict of interest, failed to specify what was supposedly a conflict of interest, and failed to state the date on which the alleged act or omission was supposedly committed." (Vaughn's brief at p. 34.)
An indictment "`must clearly inform the accused of the offense with which he is being charged and must do so in language that is readily understood by the ordinary person.'" Dobyne v. State,805 So.2d 733, 750 (Ala.Crim.App. 2000), aff'd, 805 So.2d 763
(Ala. 2001), quoting Thatch v. State, 432 So.2d 8, 10
(Ala.Crim.App. 1983). Rule 13.2(a), Ala.R.Crim.P., provides that *Page 1193 
an indictment "shall be a plain, concise statement of the charge in ordinary language sufficiently definite to inform a defendant of common understanding of the offense charged and with that degree of certainty which will enable the court, upon conviction, to pronounce the proper judgment." Section 15-8-25, Ala. Code 1975, provides:
 "An indictment must state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in such a manner as to enable a person of common understanding to know what is intended and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment."
However, "`[i]t should be borne in mind that under our system of pleading, indictments are rather a statement of legal conclusions, than of facts.'" Harris v. State, 580 So.2d 33, 38
(Ala.Crim.App. 1990), quoting Hochman v. State, 265 Ala. 1, 3,91 So.2d 500, 501 (1956). "`[I]t is not required that an indictment set up the proof necessary to a conviction.'"Hochman, 265 Ala. at 3, 91 So.2d at 502, quoting McLain v.State, 15 Ala.App. 24, 72 So. 511, 512 (1916). "`The government need only allege the "essential facts necessary to apprise a defendant of the crime charged" and not its theory of the case.'"Hunt v. State, 642 So.2d 999, 1026 (Ala.Crim.App. 1993), aff'd,642 So.2d 1060 (Ala. 1994), quoting United States v. Schmidt,947 F.2d 362, 369 (9th Cir. 1991). In Alabama, "`[a]n indictment is sufficient if it substantially follows the language of the statute violated, provided the statute prescribes with definitiveness the elements of the offense.'" Travis v. State,776 So.2d 819, 836 (Ala.Crim.App. 1997), aff'd, 776 So.2d 874
(Ala. 2000), quoting Breckenridge v. State, 628 So.2d 1012,1015-16 (Ala.Crim.App. 1993).
In this case, the indictment tracked the language of §13A-10-62, and, as we hold in Part II of this opinion, that statute prescribes with definitiveness the elements of the crime of failing to disclose a conflict of interest. The indictment was sufficient to place Vaughn on notice of the nature and cause of the charge against him. The indictment specifically alleged the act or omission that was the basis of the charge and the means by which it was done — that Vaughn failed to provide public disclosure of a known potential conflicting interest while exercising a substantial discretionary function as a public servant. Although the indictment did not specifically set forth the facts that established a known potential conflicting interest, that term is specifically defined in § 13A-10-62(b). "An indictment that tracks the language of a statute that incorporates a word or phrase `defined by law' in another statute need not further clarify the incorporated word or phrase."Duncan v. State, 624 So.2d 1084, 1088 (Ala.Crim.App. 1993). See also Inmon v. State, 585 So.2d 261 (Ala.Crim.App. 1991) (holding that an indictment charging sexual abuse did not have to specifically allege that the abuse was done with the intent to sexually gratify because that intent was encompassed within the definition of the term sexual contact, which term was referenced in the indictment). Moreover, Rule 13.2(d), Ala.R.Crim.P., provides, in pertinent part, that "[i]t is not necessary to state the precise time or date at which or on which the offense is alleged to have been committed, or the place where the offense is alleged to have been committed unless the time or place is a material element of the offense." The date is not a material element of the offense of failing to disclose a conflict of interest; therefore, the date of the offense did not have to be alleged in the indictment. *Page 1194 
The indictment provided Vaughn with sufficient notice of the charge against which he was expected to defend. Therefore, the trial court properly denied Vaughn's motion to dismiss on this ground.[8]
 II.
Vaughn next contends that the trial court erred in denying his motion to dismiss the indictment on the ground that § 13A-10-62, Ala. Code 1975, is unconstitutional. (Issue III in Vaughn's brief.) Specifically, Vaughn argues that § 13A-10-62 is void for vagueness because, he says: (1) the statute does not make clear which persons fall within its scope, and (2) the term "substantial discretionary function" is not specifically defined.
 "`The doctrine of vagueness . . . originates in the due process clause of the Fourteenth Amendment, see Lanzetta v. New Jersey, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939), and is the basis for striking down legislation which contains insufficient warning of what conduct is unlawful, see United States v. National Dairy Products Corporation, 372 U.S. 29, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963).
 "`Void for vagueness simply means that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed. United States v. Harriss, 347 U.S. 612, 617, 74 S.Ct. 808, 811, 98 L.Ed. 989, 996
(1954). A vague statute does not give adequate "notice of the required conduct to one who would avoid its penalties," Boyce Motor Lines v. United States, *Page 1195 342 U.S. 337, 340, 72 S.Ct. 329, 330, 96 L.Ed. 367, 371
(195[2]), is not "sufficiently focused to forewarn of both its reach and coverage," United States v. National Dairy Products Corporation, 372 U.S. at 33, 83 S.Ct. at 598, 9 L.Ed.2d at 566, and "may trap the innocent by not providing fair warning," Grayned v. City of Rockford, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222, 227-28 (1972).
 "`As the United States Supreme Court observed in Winters v. New York, 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840 (1948):
 "`"There must be ascertainable standards of guilt. Men of common intelligence cannot be required to guess at the meaning of the enactment. The vagueness may be from uncertainty in regard to persons within the scope of the act, or in regard to the applicable tests to ascertain guilt." "`333 U.S. at 515-16, 68 S.Ct. at 670, 92 [L.Ed. at] 849-50 [citations omitted].'
 "McCrary v. State, 429 So.2d 1121, 1123-24
(Ala.Cr.App. 1982), cert. denied, 464 U.S. 913, 104 S.Ct. 273, 78 L.Ed.2d 254 (1983)."
McCall v. State, 565 So.2d 1163, 1165 (Ala.Crim.App. 1990).
 "`"As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." Kolender v. Lawson, 461 U.S. 352 [357], 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983) (citations omitted). A statute challenged for vagueness must therefore be scrutinized to determine whether it provides both fair notice to the public that certain conduct is proscribed and minimal guidelines to aid officials in the enforcement of that proscription. See Kolender, supra; Grayned v. City of Rockford, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).'"
Timmons v. City of Montgomery, 641 So.2d 1263, 1264
(Ala.Crim.App. 1993), quoting McCorkle v. State, 446 So.2d 684,685 (Ala.Crim.App. 1983). However,
 "`"[t]his prohibition against excessive vagueness does not invalidate every statute which a reviewing court believes could have been drafted with greater precision. Many statutes will have some inherent vagueness, for `[i]n most English words and phrases there lurk uncertainties.' Robinson v. United States, 324 U.S. 282, 286, 65 S.Ct. 666, 668, 89 L.Ed. 944 (1945). Even trained lawyers may find it necessary to consult legal dictionaries, treatises, and judicial opinions before they may say with any certainty what some statutes may compel or forbid."'"
Sterling v. State, 701 So.2d 71, 73 (Ala.Crim.App. 1997), quoting Culbreath v. State, 667 So.2d 156, 158 (Ala.Crim.App. 1995), abrogated on other grounds by Hayes v. State,717 So.2d 30 (Ala.Crim.App. 1997), quoting in turn, Rose v. Locke,423 U.S. 48, 49-50, 96 S.Ct. 243, 46 L.Ed.2d 185 (1975).
"`Mere difficulty of ascertaining its meaning or the fact that it is susceptible of different interpretations will not render a statute or ordinance too vague or uncertain to be enforced.'"Scott Scott, Inc. v. City of Mountain Brook, 844 So.2d 577,589 (Ala. 2002), quoting City of Birmingham v. Samford,274 Ala. 367, 372, 149 So.2d 271, 275 (1963). The judicial power to declare a statute void for vagueness "should be exercised only when *Page 1196 
a statute is so incomplete, so irreconcilably conflicting, or so vague or indefinite, that it cannot be executed, and the court is unable, by the application of known and accepted rules of construction, to determine, with any reasonable degree of certainty, what the legislature intended." Jansen v. State exrel. Downing, 273 Ala. 166, 170, 137 So.2d 47, 50 (1962).
Contrary to Vaughn's contention, as noted in Part I.A. of this opinion, § 13A-10-62 clearly governs conduct by public servants, and the term public servant is plainly and unambiguously defined in §§ 13A-10-60(b)(3) and 13A-10-1(7), Ala. Code 1975. In addition, although the term "substantial discretionary function" is not specifically defined in the criminal code, we do not find this to be fatal. See, e.g., State v. Randall, 669 So.2d 223,226 (Ala.Crim.App. 1995) (holding that Alabama's stalking law, §13A-6-90 et seq., Ala. Code 1975, was not void for vagueness, even though the terms "repeatedly" and "series" were not specifically defined); Musgrove v. State, 519 So.2d 565, 582-83
(Ala.Crim.App.), aff'd, 519 So.2d 586 (Ala. 1986) (holding that the kidnapping statute, § 13A-6-43, Ala. Code 1975, was not void for vagueness, even though the term "terrorize" was not specifically defined); and Farris v. State, 432 So.2d 538,539-40 (Ala.Crim.App. 1983) (holding that § 13A-7-44, Ala. Code 1975, criminal possession of explosives, was not void for vagueness, even though the term "explosives" was not specifically defined). Compare McCorkle, 446 So.2d at 685 (holding that §13A-14-1, Ala. Code 1975, was unconstitutionally vague because it failed to define the term "legal duty" which, the Court said, had "several established meanings").
"It is well accepted that a court, in interpreting a statute, will give words used therein their `"natural, plain, ordinary, and commonly understood meaning."'" State v. Randall,669 So.2d at 226, quoting Ex parte Etowah County Board of Education,584 So.2d 528, 530 (Ala. 1991).
 "`Although penal statutes are to be strictly construed, courts are not required to abandon common sense. Absent any indication to the contrary, the words must be given their ordinary and normal meaning.'"
Musgrove, 519 So.2d at 582, quoting Walker v. State,428 So.2d 139, 141 (Ala.Crim.App. 1982).
The commentary to § 13A-10-62 provides, in part: "The public servant must be in a position to `exercise any substantial discretionary function,' e.g., approve a contract, negotiate the terms, etc." This is the only indication in the Code of the scope of the term substantial discretionary function and this list of examples is clearly not exhaustive. Thus, we must look to the ordinary and common meaning of the terms. "Discretionary function" or "discretionary act" is defined in Black's LawDictionary 467 (6th ed. 1996), as "[t]hose acts wherein there is no hard and fast rule as to [the] course of conduct that one must or must not take" and "[o]ne which requires exercise in judgment and choice and involves what is just and proper under the circumstances."[9] "Substantial" is defined in Black's LawDictionary 1428 (6th ed. 1996), as "[o]f real worth and importance; of considerable value; valuable . . . [s]omething worthwhile as distinguished from something without value or merely nominal" and as being "[s]ynonomous with material." The trial court instructed the *Page 1197 
jury on these commonly understood definitions in its oral charge.[10]
When the ordinary and common meaning of the term "substantial discretionary function" is applied to this statute as well as the definitions of "public servant" and "potential conflicting interest," it is clear that § 13A-10-62 governs the conduct of any person acting as an advisor or consultant to the government in performing a governmental function and that it prohibits any such person who is exercising his or her judgment and choice on a matter material to any government contract, purchase, payment, or other pecuniary transaction from owning directly or indirectly a substantial portion of any nongovernmental entity involved in that government contract, purchase, payment, or pecuniary transaction.
Section 13A-10-62 defines the offense of failing to disclose a conflict of interest with sufficient definitiveness that ordinary people are provided fair warning of what conduct is prohibited and who falls within the scope of the statute. Therefore, we hold that § 13A-10-62 is not unconstitutionally void as being vague.
 III.
Vaughn also contends that the trial court's jury instruction regarding the definition of "substantial discretionary function" impermissibly "broadened the possible bases for a conviction." (Issue IV in Vaughn's brief.) At the conclusion of the court's oral charge, Vaughn's counsel objected to the definition of "substantial discretionary function" as follows:
 "[I]n our requested charge we put in something I got out of the commentary to [§] 13A-10-62 about negotiating contracts and signing contracts. The court went beyond that. The first part of the section is when you were talking about although not susceptible to precise definitions, and then you gave a couple of definitions. I do not know that that is what the Legislature intended. And, again, I think the problem is in the very beginning. It is not with the people in this room. The problem is with the way the statute was drafted. The Legislature did not give adequate guidance in what it was talking about. Nowhere in the Alabama Code is the term `substantial discretionary function' defined. I did [an electronic legal database] search on `substantial discretionary function' and came up with nothing on that. So we do object to the court going beyond what we could pull out of the commentary and trying to come up with something to what that might mean. Again, I think the problem is nobody knows what that means. It is vague as written and vague as applied to the facts of this case.
". . . .
 "In addition, we feel that the charge of substantial discretionary function, though this Court has made a valiant effort to define, is void for vagueness and fails to sufficiently put on notice a citizen as to what charge he might — what conduct he might or might not engage in. It gives no firm definition to that very vague term. For those reasons, we make that objection."
(R. 792-97.)[11]
"`A trial court has broad discretion in formulating its jury instructions, *Page 1198 
provided they are an accurate reflection of the law and facts of the case.'" Toles v. State, 854 So.2d 1171, 1175 (Ala.Crim.App. 2002), quoting Coon v. State, 494 So.2d 184, 186 (Ala.Crim.App. 1986). "A trial judge may explain to the jury the legal terms involved in his instructions where his explanation does not qualify, limit, or modify them." Brackin v. State,417 So.2d 602, 605 (Ala.Crim.App. 1982).
The trial court defined "substantial discretionary function" for the jury as follows:
 "At the time when a person is acting as a public servant, the person must have been in a position to exercise a substantial discretionary function; such as, approval of a contract or negotiating the terms of a contract, and he must have been aware of the potential conflicting interest.
 "Although the term `substantial discretionary function' is not susceptible to precise definition, in all legal contexts, it can be described as follows: Substantial may be defined as of real worth and importance, something worthwhile as distinguished from something without value or merely nominal. It can also be described as synonymous with material.
 "Discretionary acts are those characterized by a substantial degree of discretion and judgment involved in weighing alternatives and making choices with respect to public policy and planning.
 "Stated another way, discretionary functions can be described as those acts to which there is no hard and fast rule as to the course of conduct, and one . . . requiring an exercise in judgment and choice and involving what is just and proper under the circumstances."
(R. 785-86.)
As noted in Part II of this opinion, the definitions the trial court used were, for the most part, those definitions found inBlack's Law Dictionary,[12] and they were clear, concise, and accurate.
In addition, we agree with the following argument by the State:
 "Vaughn also argues that the trial court's jury instruction on `substantial discretionary authority' was erroneous and misleading. The trial court instructed Vaughn's jurors that `substantial discretionary authority' meant, basically, the power to `weigh alternatives and make choices on public policy' in a manner, or to an extent, that is `material'. (R. 784-787)
 "Vaughn argues that this definition is overly broad, and that a narrower definition would have been the proper one for the trial court to give the jury, one recognizing the qualifier that the power to weigh alternatives, and to make choices, be `uncontrolled by the judgment and conscience of others[']. See Vaughn's Brief, at p. 40.
 "Vaughn's point is that, since he did not have the unilateral authority to select the site in the final instance, the discretionary function he exercised was not substantial. Vaughn is wrong about this, however.
 "Whether Vaughn had the discretion to make the decision on the site selection in the final instance is not really the point. The discretion on Vaughn's part *Page 1199 
that matters to this case is not necessarily his discretion to make the site selection. Rather, the discretion at issue in this case is Vaughn's discretion to make the site recommendation to the people who would make the site selection.
 "Vaughn was hired to do an analysis and make a site recommendation. He conducted his analysis, made his recommendation, and was paid $25,000. What he failed to do was disclose, to the state officials who were to rely on his recommendation, the fact that he had a financial interest in the property he was recommending.
 "Under the concept of the `substantial discretionary authority' as instructed by the trial court, or even the narrower definition suggested here by Vaughn, the discretionary authority borne out by the evidence to have been exercised by Vaughn was substantial. Under either approach, Vaughn's discretion to recommend a site was unfettered."
(State's brief at pp. 27-29.)
We find no error on the part of the trial court in its definition of "substantial discretionary function." See, e.g.,Young v. State, 724 So.2d 69 (Ala.Crim.App. 1998) (holding that trial court did not err in instructing the jury on the dictionary definitions of certain terms).
 IV.
Finally, Vaughn contends that the evidence was insufficient to sustain his conviction for failing to disclose a conflict of interest.[13] (Issue V in Vaughn's brief.)
"`In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution.'" Ballenger v. State,720 So.2d 1033, 1034 (Ala.Crim.App. 1998), quoting Faircloth v. State,471 So.2d 485, 488 (Ala.Crim.App. 1984), aff'd, 471 So.2d 493
(Ala. 1985). "`The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt.'" Nunn v. State, 697 So.2d 497, 498 (Ala.Crim.App. 1997), quoting O'Neal v. State, 602 So.2d 462, 464
(Ala.Crim.App. 1992). "`When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit [the case] to the jury, and, in such a case, this court will not disturb the trial court's decision.'"Farrior v. State, 728 So.2d 691, 696 (Ala.Crim.App. 1998), quoting Ward v. State, 557 So.2d 848, 850 (Ala.Crim.App. 1990). "The role of appellate courts is not to say what the facts are. Our role . . . is to judge whether the evidence is legally
sufficient to allow submission of an issue for decision [by] the jury." Ex parte Bankston, 358 So.2d 1040, 1042 (Ala. 1978).
Moreover, any "inconsistencies and contradictions in the State's evidence, as well as [any] conflict between the State's evidence and that offered by the appellant, [goes] to the weight of the evidence and [creates a question] of fact to be resolved by the jury." Rowell v. State, 647 So.2d 67, 69-70
(Ala.Crim.App. 1994). "`"[T]he credibility of witnesses and the weight or probative force of testimony is for the jury to judge and determine."'" Johnson v. State, 555 So.2d 818, 820
(Ala.Crim.App. 1989), quoting Harris v. State, *Page 1200 513 So.2d 79, 81 (Ala.Crim.App. 1987), quoting in turn Byrd v. State,24 Ala.App. 451, 451, 136 So. 431, 431 (1931). "We have repeatedly held that it is not the province of this court to reweigh the evidence presented at trial." Johnson, 555 So.2d at 820. "`When the jury has passed on the credibility of evidence tending to establish the defendant's guilt, this Court cannot disturb its finding.'" Rowell, 647 So.2d at 69, quoting Collins v. State,412 So.2d 845, 846 (Ala.Crim.App. 1982). Furthermore, "`[t]his Court must view the evidence in the light most favorable to the State, and "draw all reasonable inferences and resolve all credibility choices in favor of the trier of fact."'" D.L. v.State, 625 So.2d 1201, 1204, (Ala.Crim.App. 1993), quotingWoodberry v. State, 497 So.2d 587, 590 (Ala.Crim.App. 1986).
To establish the offense of failing to disclose a conflict of interest under § 13A-10-62, the State was required to prove the following three elements: (1) that Vaughn was a public servant; (2) that Vaughn exercised a substantial discretionary function in connection with a government contract, purchase, payment, or other pecuniary transaction; and (3) that Vaughn failed to provide public disclosure of a known potential conflicting interest.
Vaughn makes three specific contentions. First, Vaughn contends that the State failed to prove that he was a public servant because, he says, the State failed to prove that the compensation he received from the State of Alabama for the comparative site analysis constituted more than 50% of his income. However, as noted in Part I.A. of this opinion, whether the compensation paid to Vaughn for the analysis constituted more than 50% of his income was not an element of the offense of failing to disclose a conflict of interest under § 13A-10-62; thus, the State did not have to prove that he received more than 50% of his income from his fee for performing the comparative site analysis. "Public servant" is defined in § 13A-10-1(7), Ala. Code 1975, as "[a]ny officer or employee of government, including legislators and judges and any person or agency participating as an advisor,consultant or otherwise in performing a governmental function." (Emphasis added.) The evidence was undisputed that Vaughn was hired as a consultant to conduct a comparative site analysis for the State of Alabama; thus, he clearly fell within the definition of a "public servant."[14]
Second, Vaughn contends that the State failed to prove that he exercised a substantial discretionary function because, he says, the analysis he submitted to the State recommending the Ripley Street property for the warehouse project was actually a collaborative recommendation by him and the two agency heads — Randall Smith of the ABC Board and Shane Bailey of ADECA — and that he never had any discretion in what site to recommend because Smith and Bailey had already determined that the Ripley Street property was the only site they wanted for the project.
The evidence showed that Vaughn was hired to perform a comparative site analysis of three potential sites for the State of Alabama and to recommend a site based on that analysis for the State of Alabama to purchase in order to build a warehouse facility for the ABC Board and ADECA. Although Garver testified that Vaughn had no discretion in which property to recommend by the time he submitted his reports in October and December 2000 because, Garver said, the decision had been made in *Page 1201 
July 2000 when Smith indicated that he was not interested in the west Montgomery property and Bailey indicated that he was not interested in the DYS property, both Bailey and Smith refuted Garver's testimony. Bailey testified that both he and Smith were interested in the DYS property and that they both thought that the DYS property was a good prospect. In addition, both Bailey and Smith testified that no decision had been made in the summer of 2000. Smith testified that, although the group was "beginning to lean toward" the Ripley Street property in the summer of 2000, the decision had not actually been made and the other properties had not been excluded from consideration. (R. 387.) In addition, Bailey specifically testified that it was not until after "the analysis was complete and we were going to compare the three sites and try to make a decision" that the State decided to focus on the Ripley Street property. (R. 364.)
As noted above, conflicting evidence is for the jury to resolve, not for this Court. Based on the testimony presented at trial, the jury could have reasonably concluded that Vaughn's analysis and recommendation was not the result of Bailey and Smith's deciding that the Ripley Street property was the only alternative, but was, in fact, Vaughn's recommendation based on the exercise of his own judgment and choice and on what he felt was just and proper under the circumstances, i.e., a discretionary act. Although there is no doubt that input from Smith and Bailey regarding the needs of the ABC Board and ADECA was of paramount importance in the analysis and recommendation, there was evidence — specifically, Smith and Bailey's testimony — from which the jury could have concluded that it was Vaughn, and not Smith and Bailey, who made the ultimate decision as to which property to recommend to the State. In addition, the jury could have concluded from the evidence that Vaughn's analysis and recommendation was of value and importance and was material to the State's ultimate decision with respect to the three parcels of property, i.e., that it was substantial. Therefore, we find that there was sufficient evidence presented at trial from which the jury could have reasonably concluded that Vaughn exercised a substantial discretionary function when doing the comparative site analysis and recommendation.
Finally, Vaughn contends that the State failed to prove that he had a known potential conflicting interest because, he says, even assuming that the site analysis constituted a substantial discretionary function, he did not acquire any interest in C H investments until "well after the property had been selected and after the State of Alabama had decided not to purchase the property." (Vaughn's brief at p. 44.) Vaughn's argument in this regard is based on his testimony at trial and Nolin's testimony at trial that he did not purchase his 50% of C H Investments until December 11, 2000, after the State realized in November that it did not have the funds to purchase the property and only four days before his final analysis was submitted to the State on December 15, 2000.
Although Vaughn and Nolin testified that Vaughn did not acquire any interest in C H Investments until December 11, 2000, Terry Wilson, who drew up the bill of sale, testified that the bill of sale was executed within "a couple of weeks" of the formation of C H Investments, i.e., sometime in mid-September 2000. (R. 222.) If the jury believed this testimony as well as the testimony of Bailey that no final decision was to be made regarding the Ripley Street property until after Vaughn's analysis and recommendation was submitted to the State, it could have reasonably concluded that Vaughn "own[ed] directly or indirectly a substantial *Page 1202 
portion of [a] nongovernmental entity participating in the transaction," i.e., that he had a known potential conflicting interest. § 13A-10-62(b), Ala. Code 1975.[15]
Therefore, viewing the evidence in the light most favorable to the State and resolving all credibility choices in favor of the jury's verdict, as we must, we conclude that there was sufficient evidence from which the jury could have reasonably concluded that Vaughn was a public servant who exercised a substantial discretionary function and who did not disclose a known potential conflicting interest.
Based on the foregoing, the judgment of the trial court is affirmed.
AFFIRMED.
McMILLAN, P.J., and BASCHAB, J., concur. WISE, J., dissents, without opinion. COBB, J., recuses herself.
* Note from the reporter of decisions: The appellant's name in the indictment is spelled "Roland Vaughn." The Court of Criminal Appeals uses the spelling in the indictment to style its case. However, it appears that the correct spelling of the appellant's name is "Roland Vaughan."
[1] Nolin testified on Vaughn's behalf.
[2] Bailey testified that although he never walked on the property, he went to a nearby hill and looked at the property. According to Bailey, the property looked like wetlands, very dissimilar to the plans that Vaughn had shown him, and he was concerned whether the property was appropriate for building a warehouse.
[3] The letter stated, in pertinent part:
 "Pursuant to your meeting Friday with Roland Vaughn of Sherlock, Smith Adams, this letter is to convey our offer for approximately 260 acres of backland . . . for the price of $300,000.
 "We agree to a 60-day due-diligence period for a $10,000 earnest money deposit. . . . If we do not want to pursue the development of this property at the end of the 60-day period, this deposit will be refunded in full.
 "If we wish to go forward beyond the 60-day initial research period, an additional $10,000 will be deposited into the escrow account. At the end of this 60-day period, we will either have to close within 15 days of the end of the second 60-day period or lose the entire $20,000 deposit."
(C. 385.) (Emphasis added.)
[4] Garver specifically testified that by the time Vaughn submitted his analysis to the State, he essentially had no choice but to recommend the Ripley Street property because Smith and Bailey had already made the decision to pursue the Ripley Street property.
[5] The record reflects that in October 2000, the Secretary of State's office requested clarification of the articles of organization, specifically the name of the registered agent. On the amendment to the articles of organization that Wilson filed in October 2000, Nolin was again listed as the sole owner of C 
H Investments.
[6] Garver testified that Baker Appraisals was hired to appraise the property; Carmichael Engineering was hired to perform a phase-one environmental assessment of the property; and Lucido and Oliver was hired to do a boundary survey.
[7] Section 36-25-1, Ala. Code 1975, provides, in pertinent part:
 "Whenever used in this chapter, the following words and terms shall have the following meanings:
". . . .
 "(23) Public Employee. Any person employed at the state, county, or municipal level of government or their instrumentalities, including governmental corporations and authorities, but excluding employees of hospitals or other health care corporations including contract employees of those hospitals or other health care corporations, who is paid in whole or in part from state, county or municipal funds. For purposes of this chapter, a public employee does not include a person employed on a part-time basis whose employment is limited to providing professional services other than lobbying, the compensation for which constitutes less than 50 percent of the part-time employee's income."
(Emphasis added.)
[8] We note that the State provided a more definite statement of the charges to Vaughn:
 "In approximately March 2000, Roland H. Vaughan [sic], President of Sherlock, Smith and Adams Architects Engineers, was hired by Ralph Garver, Assistant Finance Director and Acting Purchasing Director of the Alabama Department of Finance, to consult with the State of Alabama and provide a study of sites under consideration by the Alabama Department of Economic and Community Affairs and/or the Alabama Beverage Control Board. Both of the said agencies were seeking new locations for new warehouses.
 "Roland H. Vaughan, through Sherlock, Smith Adams, prepared a multi-site analysis. This analysis dealt with three sites for potential development: one in west Montgomery, one in east Montgomery, and one along North Ripley Street in Montgomery. Roland H. Vaughan's final site analysis, dated December 15, 2000, recommended that the State of Alabama purchase of 256 acres of property known as the . . . Ripley Street property. Roland H. Vaughan then submitted to the State of Alabama a $25,000.00 invoice for the multi-site analysis. Sherlock, Smith and Adams received payment from the State of Alabama in the amount of $25,000.00.
 "On August 25, 2000, C H Investments, L.L.C., owned by Andrew Nolin, acquired an option to purchase 256 acres of property, known as the . . . Ripley Street property, from the Haardt family. On August 30, 2000, C H Investments, L.L.C. was incorporated in Montgomery County, Alabama by Andrew Nolin. Roland H. Vaughan then became a 50% partner in C H Investments, L.L.C.
 "In November 2000, Roland H. Vaughan told Ralph Garver that the Haardt family owned the . . . Ripley Street property. Roland H. Vaughan failed to disclose his personal ownership interest in the . . . Ripley Street property. Therefore, Roland H. Vaughan created or confirmed another's impression which was false and which he did not believe to be true; or he failed to correct a false impression which he previously created or confirmed; or he failed to correct a false impression when he was under a duty to do so.
 "Had Roland H. Vaughan disclosed his ownership interest in the . . . Ripley Street property, the State of Alabama would not have paid Roland H. Vaughan or Sherlock, Smith and Adams $25,000.00."
(C. 78-79.)
[9] This term is defined in Black's Law Dictionary 479 (7th ed. 1999), as "[a] deed involving an exercise of personal judgment and conscience."
[10] See Part III of this opinion.
[11] During its deliberations, the jury asked to be recharged on the offense of failing to disclose a conflict of interest; the trial court gave the same instruction it had previously given. Vaughn objected to the instruction on the same grounds previously raised.
[12] The trial court's first definition — that "[d]iscretionary acts are those characterized by a substantial degree of discretion and judgment involved in weighing alternatives and making choices with respect to public policy and planning" — was requested by the State. It came not from Black's LawDictionary, but from Trujillo v. Utah Department ofTransportation, 986 P.2d 752, 759 (Utah Ct.App. 1999) (wherein the court used this definition for purposes of applying the "discretionary function" variant of governmental immunity).
[13] Vaughn preserved this issue when he moved for a judgment of acquittal at the close of the State's case and again at the close of all the evidence. Vaughn also raised this issue in his motion for a new trial.
[14] In fact, Vaughn does not dispute that he falls within the definition of "public servant" in § 13A-10-1(7); his only argument is that he does not also fall within the definition of "public employee" in § 36-25-1(23), Ala. Code 1975.
[15] In addition, Vaughn does not dispute that he did not make a "public announcement or notification to a superior officer or the Attorney General" regarding his interest in C H Investments. § 13A-10-62(c), Ala. Code 1975.