KELLUM, Judge.
The appellant, Johnson Augustus Powell, was convicted of one count of unlawful transport of articles containing sounds transferred without the consent of the owner, a violation of § 13A-8-81(a)(3), Ala. Code 1975. The trial court sentenced Powell to three years’ imprisonment. The trial court also ordered Powell to pay a $15,000 fine, $1,750 in restitution each to the Recording Industry Association of America (“RIAA”) and the Motion Picture Association of America (“MPAA”), $50 to the crime victims compensation fund, attorneys fees, and court costs.
The evidence presented at trial established the following pertinent facts. On February 23, 2008, Deputies Charles Turner and Jason Paul of the Blount County Sheriffs Department were patrolling Interstate 65 in Blount County when they observed a vehicle being driven by Powell traveling above the posted speed limit. The deputies initiated a traffic stop, during which Deputy Turner asked Johnson for, and was given, consent to search Johnson’s vehicle. Deputy Paul searched the vehicle and discovered three duffel bags filled with a large quantity of what Deputy Paul believed to be unlawful, or “pirated,” copies of CDs and DVDs. According to Deputies Turner and Paul, the CDs and DVDs were not packaged in a manner typical for CDs and DVDs, did not contain the standard licensing and copyright information, and were labeled with a black marker.
The deputies arrested Johnson and called Deputy Roger Dabbs of the Blount *1271 County Sheriffs Department to assist them. After arriving on the scene, Deputy Dabbs advised Powell his Miranda[1] rights, and after waiving those rights, Powell decided to cooperate with the deputies. According to Dabbs, Powell told the officers that he was in the business of buying and selling CDs and DVDS and that he would buy the items for $3 apiece and would sell them for $5. At the time he was arrested, Powell was driving to a gasoline station to meet someone to sell the CDs and DVDs. Powell also told the officers that he sold the items in North Carolina, South Carolina, Georgia, Tennessee, and Alabama. Deputies Turner, Paul, and Dabbs all testified at trial. On cross-examination, each deputy admitted that he did not know if Powell had permission from the owners of the copyrighted material to reproduce or sell the CDs and DVDs in his possession.
James H. Duff, an investigator with the MPAA and the RIAA, also testified for the State at trial. Duff explained that on behalf of the RIAA and MPAA he analyzes and investigates law-enforcement cases involving unauthorized copying of music and movies that belong to the members constituting the RIAA and MPAA. Duff analyzed the CDs and DVDs recovered from Powell’s vehicle and explained that he believed that the CDs and DVDs were unauthorized copies of the copyrighted material. Duff based this conclusion on his belief that the CDs and DVDs were “pirated”— i.e., the CDs and DVDs did not include “the artist work or the sleeve or the jewel case” associated with industry-produced CDs or DVDs. (R. 140.) Additionally, Duff believed the CDs and DVDs to be pirated because the CDs and DVDs contained copyrighted material that had been “burned” onto rewritable discs using blank CDs and DVDs, which he referred to as CDRs and DVDRs. Duff explained that CDs and DVDs released pursuant to RIAA and MPAA standards contain copyrighted material that had been “pressed” into the CD or DVD. Duff contrasted a “burned” CD or DVD from a “pressed” CD or DVD by explaining that the former stores information on the top of the CD or DVD, while the latter stores information in the middle of the CD or DVD.[2]
The following discussion regarding the music and movie industry’s usage of rewritable CDs and DVDs took place during Duffs testimony:
“[The State]: Based upon your training, your experience, your education and your employment with these two [associations], do any of the licensees that are members of the two [associations] ever give permission to put their data, their intellectual property, on recordable [CDs] or [DVDs]?
“[Defense Counsel]: Objection, Your Honor. There is no possible way he could know what their permission is. He is not a member of the organization. It is all speculative.
“THE COURT: I’ll let him answer.
“[Duff]: I have been trained on their practices and investigated many cases, and they do not allow any product to be put on a re-writable CD or DVD.
“[The State]: Do you know why that is, sir?
“[Duff]: I do not know that.
“[The State]: You can say that is true throughout the United States industry-wide?
*1272 “[Duff]: That is industry-wide with the [motion-picture industry] and the [recording-industry associations].
“[The State]: And any intellectual data that is placed on anything other than those [DVDs] and [CDs] that you just described would be pirated. Would that be a fair statement?
“[Duff]: I think they can sell or give away their rights to another label or something like that. Like an artist will change labels, but it still has to come down to be put on a pressed CD or a pressed DVD.
“[The State]: Not a recordable CD or DVD?
“[Duff]: Not a recordable CD or DVD.”
(R. 142-43.)
On cross-examination, Duff testified that the RIAA and MPAA were not the owners of the copyrights in question, but that he, as an agent of the RIAA and MPAA, was a representative of the owners. Powell questioned Duff extensively about the digital distribution of copyrighted material, but Duff admitted that he was not very familiar with the rules and regulations regarding digital distribution and could not testify whether the music and movies contained on the CDs and DVDs found in Powell’s vehicle had been legally digitally downloaded. Duff repeated his testimony that it was his belief, based on his training and instructions from the RIAA and MPAA, that copyrighted material “cannot be put on a CDR or a DVDR.” (R. 145.) When asked if one could copy lawfully purchased music onto a CDR for a noncommercial purpose, Duff testified yet again that it was his belief that the RIAA and the MPAA prohibit such action. Powell introduced into evidence information obtained from the RIAA’s Web site indicating that it is legal for an individual to copy music onto a CDR so long as it is not being done for a commercial purpose. Duff admitted that he had no knowledge of the CDs and DVDs contained in Powell’s personal collection.
At the conclusion of Duffs testimony, the State rested. Powell then moved for a judgment of acquittal based on the State’s failure to prove that the copyrighted material contained in the CDs and DVDs was transferred without the consent of the owners. The trial court denied Powell’s motion, and Powell rested without calling any witnesses on his behalf. After both sides delivered their closing arguments, the trial court instructed the jury on the applicable law. The jury convicted Powell of the unlawful transport of articles containing sounds transferred without consent of the owner as charged in his indictment. Powell appealed.
I.
Powell argues that the trial court erroneously denied his motion to dismiss his indictment on the grounds that § 13A-8-81(a)(3), Ala.Code 1975, is impermissibly vague. Powell contends that the statute does not fairly apprise an ordinary person of what specific acts are criminalized and also alleges that the statute allows for arbitrary enforcement. In support of these allegations, Powell refers to the discussions at trial in which the court, the State, and Powell’s defense attorney could not agree on- the plain meaning of the statute, as well as the police officers’ admissions that they would not enforce this law under certain situations.
In Barber v. Jefferson County Racing Ass’n, Inc., 960 So.2d 599 (Ala.2006), the Alabama Supreme Court explained:
“ ‘In reviewing the constitutionality of a statute, we “approach the question with every presumption and intendment in favor of its validity, and seek to sustain rather than strike down the enactment *1273 of a coordinate branch of the government.” ’ Moore v. Mobile Infirmary Ass’n, 592 So.2d 156, 159 (1991) (quoting Alabama State Fed’n of Labor v. McAdory, 246 Ala. 1, 9, 18 So.2d 810, 815 (1944)). Overcoming that presumption is a heavy burden, which is borne by the party challenging the validity of the statute. Densmore v. Jefferson County, 813 So.2d 844, 856 (Ala.2001); Jefferson County Bd. of Health v. City of Bessemer, 293 Ala. 237, 301 So.2d 551 (1974).”
960 So.2d at 615.
In Vaughn v. State, 880 So.2d 1178 (Ala.Crim.App.2003), this Court set forth the following guidelines for addressing constitutional challenges on vagueness grounds:
“ ‘ “The doctrine of vagueness ... originates in the due process clause of the Fourteenth Amendment, see Lanzaetta v. New Jersey, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939), and is the basis for striking down legislation which contains insufficient warning of what conduct is unlawful, see United States v. National Dairy Products Corporation, 372 U.S. 29, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963).
“ ‘ “Void for vagueness simply means that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed. United States v. Harriss, 347 U.S. 612, 617, 74 S.Ct. 808, 811, 98 L.Ed. 989, 996 (1954). A vague statute does not give adequate ‘notice of the required conduct to one who would avoid its penalties,’ Boyce Motor Lines v. United States, 342 U.S. 337, 340, 72 S.Ct. 329, 330, 96 L.Ed. 367, 371 (1951), is not ‘sufficiently focused to. forewarn of both its reach and coverage,’ United States v. National Dairy Products Corporation, 372 U.S. at 33, 83 S.Ct. at 598, 9 L.Ed.2d at 566, and ‘may trap the innocent by not providing fair warning,’ Grayned v. City of Rockford, 408 U.S. 104, 108, 92 S. Ct. 2294, 2298, 33 L.Ed.2d 222, 227-28 (1972).
“ ‘ “As the United States Supreme Court observed in Winters v. New York, 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840 (1948):
“ ‘ “ ‘There must be ascertainable standards of guilt. Men of common intelligence cannot be required to guess at the meaning of the enactment. The vagueness may be from uncertainty in regard to persons within the scope of the act, or in regard to the applicable tests to ascertain guilt.’
“ ‘ “333 U.S. at 515-16, 68 S.Ct. at 670, 92 [L.Ed. at] 849-50 [citations omitted].”
“ McCrary v. State, 429 So.2d 1121, 1123-24 (Ala.Cr.App.1982), cert. denied, 464 U.S. 913, 104 S.Ct. 273, 78 L.Ed.2d 254 (1983).’
“McCall v. State, 565 So.2d 1163, 1165 (Ala.Crim.App.1990).
“““As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.’ Kolen-der v. Lawson, 461 U.S. 352 [357], 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983) (citations omitted). A statute challenged for vagueness must therefore be scrutinized to determine whether it provides both fair notice to the public that certain conduct is proscribed and minimal guidelines to aid officials in the enforcement of that *1274 proscription. See Kolender, supra; Grayned v. City of Rockford, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).” ’
“Timmons v. City of Montgomery, 641 So.2d 1263, 1264 (Ala.Crim.App.1993), quoting McCorkle v. State, 446 So.2d 684, 685 (Ala.Crim.App.1983). However,
“ ‘ “ ‘[tjhis prohibition against excessive vagueness does not invalidate every statute which a reviewing court believes could have been drafted with greater precision. Many statutes will have some inherent vagueness, for “[i]n most English words and phrases there lurk uncertainties.” Robinson v. United States, 324 U.S. 282, 286, 65 S.Ct. 666, 668, 89 L.Ed. 944 (1945). Even trained lawyers may find it necessary to consult legal dictionaries, treatises, and judicial opinions before they may say with any certainty what some statutes may compel or forbid.’ ” ’
“Sterling v. State, 701 So.2d 71, 73 (Ala.Crim.App.1997), quoting Culbreath v. State, 667 So.2d 156, 158 (Ala.Crim.App.1995), abrogated on other grounds by Hayes v. State, 717 So.2d 30 (Ala.Crim.App.1997), quoting in turn, Rose v. Locke, 423 U.S. 48, 49-50, 96 S.Ct. 243, 46 L.Ed.2d 185 (1975).
“ ‘ “Mere difficulty of ascertaining its meaning or the fact that it is susceptible of different interpretations will not render a statute or ordinance too vague or uncertain to be enforced.” ’ Scott & Scott, Inc. v. City of Mountain Brook, 844 So.2d 577, 589 (Ala.2002), quoting City of Birmingham v. Samford, 274 Ala. 367, 372, 149 So.2d 271, 275 (1963). The judicial power to declare a statute void for vagueness ‘should be exercised only when a statute is so incomplete, so irreconcilably conflicting, or so vague or indefinite, that it cannot be executed, and the court is unable, by the application of known and accepted rules of construction, to determine, with any reasonable degree of certainty, what the legislature intended.’ Jansen v. State ex rel. Downing, 273 Ala. 166, 170, 137 So.2d 47, 50 (1962).”
Vaughn, 880 So.2d at 1194-96. See also Barber, 960 So.2d at 616, quoting City of Chicago v. Morales, 527 U.S. 41, 56, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (“Vagueness may invalidate a criminal law for either of two independent reasons. First, it may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement.”).
Powell’s attack on the alleged vagueness of § 13A-8-81(a)(3) is threefold: (1) that the statute fails to adequately apprise him of the elements constituting the offense of the unlawful transport of sounds transferred without the consent of the owner; (2) that the statute criminalizes lawful and protected activity; and (3) that the statute allows for discriminatory and arbitrary enforcement. Additionally, Powell argues that § 13A-8-86, the statute that outlines the range of punishments for offenses contained in § 13A-8-81, does not include the offense of transport and, thus, is likewise unconstitutionally vague. With the aforementioned principles in mind, we now turn to Powell’s individual claims.
A.
Powell first contends that § 13A-8-81(a)(3) is unconstitutional because, he says, it fails to provide clear notice of its prohibited conduct and, thus, is void as a result of vagueness. Specifically, Powell claims that the statute is “nebulous” and fails to “define all of what constitutes its elements.”
*1275 Section 13A-8-81 (a)(3), Ala.Code 1975, provides: “It shall be a felony for any person to ... transport ... any article with the knowledge that the sounds or performances are so transferred without consent of the owner.” Although the statute is not a model of precise and unambiguous legislation, it is possible for one to decipher the specific act prohibited by the statute. It is apparent that an individual violates this Code section if he or she (a) transports (b) any article containing sounds or performances (c) with the knowledge (d) that the sounds or performances were transferred without the consent of the owner.
Additionally, Powell claims the statute is unconstitutionally vague in that it fails to “define all of what constitutes its elements.” We disagree. “The mere fact that a statute contains a term that is not specifically defined by the statute or as part of the statutory scheme does not automatically render the statute void for vagueness.” Lansdell v. State, 25 So.3d 1169, 1176 (Ala.Crim.App.2007). When § 13A-8-81(a)(3) is analyzed in conjunction with § 13A-8-80, the statutory elements of the offense are clarified.
Section 13A-8-80, Ala.Code 1975, defines “owner” as:
“Unless the context clearly requires otherwise, the term ‘owner,’ as used in this article, shall mean the person who owns, or has the exclusive license in the United States to reproduce or the exclusive license in the United States to distribute to the public copies of the original fixation of sounds embodied in the master phonograph record, master disc, master tape, master film or other device used for reproducing recorded sounds on phonograph records, discs, tapes, films, videocassettes or other articles now known or later developed on which sound is recorded and from which the transferred sounds are directly or indirectly derived, or the person who owns the rights to record or to authorize the recording of a live performance.”
Thus, by examining § 13A-8-80, we see definitions or examples for “sounds,” “performances,” “article,” and “owner.” Moreover, these terms — in their common usage — are terms that could be understood by the average person. Accordingly, no further clarification is needed with respect to these terms.
This Court has repeatedly held that it will give words used in a statute their “natural, plain, ordinary, and commonly understood meaning.” See Sellers v. State, 935 So.2d 1207, 1212 (Ala.Crim.App.2005). “Transport” is defined, in relevant part, as “to transfer or convey from one place to another.” Merriam-Webster’s Collegiate Dictionary 1330 (11th ed.2003). Thus, when the ordinary and commonly understood meaning of the term “transport” is combined with the definitions and descriptions and examples of “sounds,” “performances,” “article,” and “owner” found in § 13A-8-80 and applied to § 13A-8-81(a)(3), it is readily apparent that the language of § 13A-8-81 (a)(3) is sufficiently definitive for an ordinary person to understand what conduct is prohibited. Accordingly, Powell’s argument that § 13A-8-81(a)(3) did not provide sufficient notice of what conduct it prohibits is without merit.
B.
Powell also contends that § 13A-8-81(a)(3) is unconstitutionally vague in that it criminalizes conduct that is “well within the right of the consumer.” Specifically, Powell claims that § 13A-8-81(a)(3) unconstitutionally infringes on his rights under the Copyright Act, 17 U.S.C. § 101 et seq., pursuant to the doctrine of “fair use” to make “backup copies, time-shifted broadcasts, and non-commercial archiving *1276 of personal properties” of his CDs and DVDs. Powell cites Sony Corp. of America v. Universal City Studios, 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984), in support of this contention.
In Ex parte Woodard, 631 So.2d 1065 (Ala.Crim.App.1993), this Court explained:
“ ‘Vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in light of the facts of the case at hand.’ Jordan v. State, 411 So.2d 816, 818 (Ala.Cr.App.1981).
“ ‘[Bjecause “[t]he essential purpose of the ‘void for vagueness’ doctrine is to warn individuals of the criminal consequences of their conduct,” Jordan v. De George, 341 U.S. 223, 230, 71 S.Ct. 703, 707, 95 L.Ed. 886 (1951), “[o]ne to whose conduct a statute clearly applies may not successfully challenge it for vagueness,” Parker v. Levy, 417 U.S. 733, 756, 94 S.Ct. 2547, 2562, 41 L.Ed.2d 439 (1974), “even though the statute may well be vague as applied to others,” Aiello v. City of Wilmington, 623 F.2d 845, 850 (3d Cir.1980). Therefore, a defendant who challenges a statute on the grounds of vagueness “must demonstrate that the statute under attack is vague as applied to his own conduct, regardless of the potentially vague applications to others.” Aiello, 623 F.2d at 850 (emphasis added). Accord Rode v. Dellarciprete, 845 F.2d 1195, 1199-1200 (3d Cir.1988).’
“Senf [v. State, 622 So.2d 435, 437 (Ala.Crim.App.1993) ] (footnote omitted).”
631 So.2d at 1069.
Our review of § 13A-8-81 (a)(3) as applied to the facts in this case convinces us that Powell’s reliance on the Sony decision is misplaced. In Sony, Universal Studios, Inc., and Walt Disney Productions filed a copyright-infringement action against Sony, the manufacturer of the Betamax videotape recorder (“VTR”). The studios claimed that some individuals used the VTRs to record copyrighted material and, thus, infringed upon the studios’ copyrights. The studios alleged that Sony — as manufacturers of the VTRs — should therefore be held vicariously liable for the copyright violations under the theory of contributory infringement. Sony argued that the vast majority of usage of the VTRs came in the form of “time-shifting” — the practice of recording a program to view at a different time — or other noncommercial uses. In holding that the district court had correctly concluded that the manufacturing of the VTRs did not constitute contributory infringement, the Supreme Court concluded, in part, that the VTRs were capable of substantial non-infringing uses. According to the Court, one of those non-infringing uses was the practice of either authorized or unauthorized, non-commercial “time-shifting,” which constituted “fair use” of an audiovisual work under 17 U.S.C.A. § 107. See, Sony, 464 U.S. at 456.
Although the Supreme Court recognized that either authorized or nonau-thorized noncommercial time-shifting constituted “fair use” under the Copyright Act, we note that Powell does not allege, nor would the evidence support a contention, that his activities with respect to the CDs and DVDs in his possession could be classified as time-shifting. “ ‘A defendant who challenges a statute on the ground of vagueness “must demonstrate that the statute under attack is vague as applied to his own conduct, regardless of the potentially vague applications to others.” ’ Senf v. State, 622 So.2d 435, 437 (Ala.Cr.App.1993), quoting Aiello v. City of Wilmington, 623 F.2d 845, 850 (3rd Cir.1980).” Culbreath v. State, 667 So.2d 156, 158-59 (Ala.Crim.App.1995), overruled on other *1277 grounds, Hayes v. State, 717 So.2d 30 (Ala.Crim.App.1997) (emphasis in Culbreath). Thus, merely because § 18A-8-81(a)(3) might conceivably criminalize the transport of articles that could be classified as “fair use” noncommercial, time-shifted audiovisual recordings, this argument entitles Powell to no relief because his conduct did not fall into this category of activity.
Furthermore, to the extent that Powell contends that the holding of Sony also protects home-audio recording practices, such as archiving or creating backup copies, we observe that the Supreme Court in Sony looked exclusively at the practice of “time-shifting” audiovisual recordings. Therefore, we do not believe that the Court in Sony recognized any “fair use” practice other than the noncommercial time-shifting of audiovisual recordings. See also 2 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 8B.01[D][2] (Matthew Bender, Rev. Ed.)(“[T]he Supreme Court [in Sony ] considered time-shifting, and only time-shifting, in reaching its conclusion that off-the-air videotaping is fair use.”)
However, Powell’s contention that the Copyright Act protects archival practices with respect to audio recordings deserves closer examination. In 1992, Congress passed the Audio Home Recording Act of 1992 (“AHRA”), 17 U.S.C. § 1001 et seq. The AHRA achieved, among others, the goal of “[affording] immunity to home tapers who make copies without direct or indirect commercial motivation.” 2 Nim-mer on Copyright, § 8B.01[C].
The AHRA states, in part:
“No action may be brought under this title alleging infringement of copyright based on the manufacture, importation, or distribution of a digital audio recording device, a digital audio recording medium, an analog recording device, or an analog recording medium, or based on the noncommercial use by a consumer of such a device or medium for making digital musical recordings or analog musical recordings.”
17 U.S.C.A. § 1007.
“The exemption from copyright infringement liability in [17 U.S.C.A. § 1007] extends not only to the foregoing acts of importation, manufacture, and distribution, but also to ‘the noncommercial use by a consumer’ of such digital recorders and tapes as well as audio recorders and tapes.
“The instant exemption, being limited to noncommercial exploitations, is much narrower than the foregoing exemption. In another respect, however, it is much broader. The foregoing exemption did not confer any right to engage in the crucial act of reproducing any copyrighted works. The instant exemption, by contrast, allows home users to copy otherwise protected musical compositions and sound recordings. In the words of one lawmaker, ‘No longer will consumers be branded copyright pirates for making a tape for their car or for their children.’ [Fn. 48.] This immunity applies whether those devices or media are used to make digital musical recordings, or analog musical recordings.
“Fn. 48. 138 Cong. H9033 (daily ed. Sept. 22) (statement of Rep. Hughes) (the bill ‘removes the legal cloud over home copying of prerecorded music in the most proconsumer way possible.’) See S. Rep. (AHRA), p. 51 (‘the making of an audiogram by a consumer for use in his or her home, car, or portable tape player, or for a family member, is protected’).
“As previously noted, before Congress passed the AHRA it was open to argument whether an individual who taped music off the radio in the privacy of her home and for purely private purposes *1278 thereby committed copyright infringement, or was immunized from liability under the fair use doctrine. Such taping that takes place at present is, by virtue of the AHRA, immune from liability. [Fn. 55.]
“Fn. 55. See 17 U.S.C. § 1008. ‘[T]his legislation will end the 22-year-old debate and make it clear that home taping does not constitute copyright infringement.’ 138 Cong. Rec. H9033 (daily ed. September 22, 1992)(statement of Rep. Moorhead).
“Does this mean that a home duplicator can sell tapes thereby produced? As set forth above, this exemption is limited by a restriction to noncommercial purposes. Thus, making a reproduction, whether done in digital or analog format, for purposes of sale — even for sale to the consumers’ children, one imagines — remains proscribed. The legislative history states:
“ ‘[A] person who makes multiple copies of a particular audiogram [Fn. 56] and sell those copies to others would not be protected by the prohibition against copyright infringement actions contained in this legislation.’
“Fn. 56. The term ‘audiogram’ was later changed to ‘digital musical recording.’ See § 8B.02[A][1] supra.
“Although that comment was directed at a prior bill, [Fn. 59] the preservation in the enacted text of the Audio Home Recording Act of 1992 of the language that only ‘noncommercial use by a consumer’ escapes liability carries forward that gloss. Taping and selling and other commercial applications therefore remain subject to copyright infringement liability.
“Fn. 59. The original text of the AHRA, instead of barring suit against those who made noncommercial use, barred suit generally but contained an exception for those who make copies ‘for direct or indirect commercial advantage’). S. Rep. (AHRA), p. 4 (Sec. 1002(a)(1) of bill). It then defined ‘not for direct or indirect commercial advantage’ as being copying ‘by a consumer for private, noncommercial use.’ Id. (Sec.l002(a)(2) of bill). Although less explicit, the final text of the AHRA would seem to carry forward the same meaning.”
2 Nimmer on Copyright, § 8B.07[C][2].
As previously stated, Powell bears the burden of proving that § 13A-8-81(a)(3) is unconstitutional as applied to his conduct. Culbreath, 667 So.2d at 158-59. Although it is clear that Congress added the AHRA to the Copyright Act, in part, to protect noncommercial, home-tapers from copyright liability, the AHRA does not protect those who engage in commercial taping activity. Here, the State presented ample evidence indicating that Powell’s activities were commercial in nature. According to Deputy Dabbs, Powell stated that he would buy the CDs and DVDs for $3 apiece and would sell them for $5 apiece. Deputy Paul testified that he heard Powell say he was in the business of selling the CDs and DVDs. Although Powell’s counsel cross-examined the deputies about archival activities and made arguments to the trial court regarding potentially protected activities, Powell presented no evidence tending to show that his activities were noncommercial in nature. Thus, it is readily apparent that the activities in which Mr. Powell were engaged could not be classified as one of the activities protected by the AHRA.
Likewise, it is irrelevant that another individual might have a stronger, possibly valid, constitutional challenge to the validity of § 13A-8-81(a)(3) under a different factual situation. As the United State Supreme Court observed, in the context of *1279 vagueness: “Nor is it unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line.” Boyce Motor Lines v. United States, 342 U.S. 337, 340, 72 S.Ct. 329, 96 L.Ed. 367 (1951). The facts of this case indicate that Powell did, in fact, enter into an area of conduct proscribed by § 13A-8-81(a)(3). Therefore, the fact that certain conduct falling within the purview of the statute might be lawful is irrelevant. Accordingly, Powell’s argument that § 13A-8-81(a)(3) unconstitutionally infringes on some protected rights fails when we apply the statute to the facts at hand.
C.
Powell also contends that § 13A-8-81(a)(3) allows for impermissibly arbitrary and discriminatory enforcement. Powell directs this Court to the various portions of the trial transcript in which the police officers described how and when they exercised their discretion in enforcing the provisions of the statute.
At trial, both Deputies Paul and Dabbs admitted that them own discretion played a large roll in determining whether to prosecute a suspect for a violation of § 13A-8-81(a)(3). The following exchanges took place during Deputy Paul’s testimony:
“[The State]: Do you remember the actual count of [the DVDs and CDs recovered from Powell’s vehicle]?
“[Deputy Paul]: It was 1,920, I believe.
“[The State]: And that is what is in that box right there?
“[Deputy Paul]: Yes, sir.
“[The State]: Now if this had been some little blue-haired grandma riding down the road with three burned copies of Lawrence Welk, would you have arrested her for that?
“[Deputy Paul]: Probably not.
[[Image here]]
“[Defense counsel on cross-examination]: You said you wouldn’t arrest a little blue-haired grandma. Lawrence Welk CD’s would be a copyright matter, wouldn’t it?
“[Deputy Paul]: As far as I know.
“[Defense counsel]: So there is a distinction between who you will and will not arrest based on the same crime?
“[Deputy Paul]: The totality of the circumstances plays a lot into my decision in arrest-making, yes.
“[Defense counsel]: So the totality of the circumstances would be that you didn’t want to arrest grandma?
“[Deputy Paul]: No, that is not correct.
“[Defense counsel]: Is there a reason that grandma gets to get away with a crime.
“[Deputy Paul]: I didn’t say that either.
“[Defense counsel]: I’m very confused then. You just said—
“[Deputy Paul]: I said the totality of the circumstances based on everything that goes along with that traffic stop will make my decision-making on who I arrest and who I don’t. The last time I checked, that was my discretion.
“[Defense counsel]: So you arrest subject to discretion?
“[Deputy Paul]: Yes, sir.”
(R. 88, 90.)
The following exchanges took place during Deputy Dabbs’s testimony:
“[The State]: The fact that there was some 1,920 DVD’s and CD’s in the back of this man’s car, was that significant to you as an investigator?
“[Deputy Dabbs]: Yes sir.
“[The State]: You told Mr. Goldstein something a minute ago about there being multiple copies of each title or each CD?
*1280 “[Deputy Dabbs]: On some of them, yes, sir.
“[The State]: How many copies?
“[Deputy Dabbs]: Some of them are as many as six or seven copies.
[[Image here]]
“[Defense counsel]: You said the quantity matters. So if there was only one or two, there wouldn’t have been a problem?
“[Deputy Dabbs]: No, sir.
[[Image here]]
“[Defense counsel]: [Holding a copy of one of the DVDs seized from Powell’s vehicle] Do you know if [Powell] owns a copy of [‘The Bucket List’]?
“[Deputy Dabbs]: No, sir, I don’t.
“[Defense counsel]: Do you know if this is an archived copy of [‘The Bucket List’]?
“[Deputy Dabbs]: No, sir.
“[Defense counsel]: Aside from this mystical statement, do you have anything to say that this is being possessed for sale?
“[Deputy Dabbs]: Again, other than the sheer volume, no, sir.
“[Defense counsel]: He is not charged with possession for sale, is he?
“[Deputy Dabbs]: No, sir.
“[Defense counsel]: He is charged with traveling down the street with this?
“[Deputy Dabbs]: That’s correct.
“[Defense counsel]: You think there is anything inherently wrong with traveling down the street with this?
“[Deputy Dabbs]: Again, with the sheer volume, yes, sir, I do.
“[Defense counsel]: Let’s talk about the sheer volume. If there [were] only 10, that wouldn’t be a problem?
“[Deputy Dabbs]: To be honest with you, we probably would not have even looked further with 10.
“[Defense counsel]: Fifty?
“[Deputy Dabbs]: We would start looking.
“[Defense counsel]: Is there some fuzzy number that turns this into a crime?
“[Deputy Dabbs]: If it goes from a few to a stack, I think we would start looking further.
(R. 110,118-119.)
A criminal statute is not unconstitutionally vague if it allows for some degree of discretionary enforcement by police. As previously stated, in order to satisfy the Fourteenth Amendment of the United States Constitution, a criminal statute must provide “minimal guidelines to aid officials in the enforcement of that proscription.” See Vaughn, 880 So.2d at 1195, quoting Timmons, 641 So.2d at 1264. Here, the statute provides guidelines for enforcement. Section 13A-8-81 makes it illegal to manufacture, distribute, transport, or wholesale articles containing sounds transferred without the owners’ consent. When taken in context with the other prohibited acts, it is reasonable to conclude that law-enforcement authorities would focus their efforts on larger, commercial activities. Thus, the hypothetical situations involving the “blue-haired grandma” or “Aunt Sadie Mae” have no bearing on the facts at hand. Accordingly, § 13A-8-81(a)(3) is not unconstitutionally vague for failing to carefully direct police discretion.
D.
Powell also contends that § 13A-8-81(a)(3) is unconstitutionally vague on the grounds that upon reading § 13A-8-86— the statute setting forth the penalties for a violation of § 13A-8-81 — a layperson would not know the penalty he or she potentially faced. Specifically, Powell contends that § 13A-8-86 does not mention *1281 the offense of “transporting” unauthorized recordings as set out in § 18A-8-81(a)(3).
Section 13A-8-86, AIa.Code 1975, provides, in relevant part:
“(a) Each separate manufacture, distribution, sale or transfer at wholesale of any unauthorized recording in contravention of the provisions of this article shall upon conviction constitute a separate offense punishable as follows:
“(1) If the offense involves not less than 1,000 unlawful sound recordings or not less than 65 audio visual recordings, by imprisonment not less than three years, nor more than ten years, or by a fine of not more than $250,000.00 or both.
“(2) For any other offense not described in subdivision (a)(1), by imprisonment not less than one year, nor more than three years, or by fine of not more than $25,000.00 for the first offense, or both, and by imprisonment not less than three years nor more than 10 years, or by fine of not more than $100,000.00, or both, for any subsequent offense.”
Although § 13A-8-86 does not mention the offense of transporting unauthorized recordings as found in § 13A-8-81(a)(3), § 13A-8-81(c) explicitly states: “Penalties for violations hereof are prescribed in Section 13A-8-86(a).” Thus, even though § 13A-8-86(a) listed only the offenses of manufacture, distribution, and wholesale of unauthorized recordings, Powell was fairly apprised of the penalties he faced if convicted of the unlawful transportation of unauthorized recordings by virtue of the plain language of § 13A-8-81(c). Accordingly, Powell’s vagueness challenge as to the punishment he faced is without merit.
Based on the foregoing, we conclude that § 13A-8-81(a)(3) provides adequate notice and the procedural safeguards necessary to ensure compliance with due-process concerns under the Fourteenth Amendment. Accordingly, § 13A-8-81(a)(e) is not unconstitutionally vague, and the trial court properly denied Powell’s motion to have it declared so.
II.
Powell argues that the trial court erred in denying his motion to dismiss his indictment on the grounds that § 13A-8-81(a)(3) is preempted by the Copyright Act of 1976,17 U.S.C. § 101 et seq.
In General Motors Corp. v. Kilgore, 853 So.2d 171 (Ala.2002), the Alabama Supreme Court stated:
“In United Transportation Union v. Foster, 205 F.3d 851 (5th Cir.2000), the United States Court of Appeals for the Fifth Circuit succinctly laid out the general principles of preemption. The court stated:
“ ‘The Supremacy Clause of Article VI of the United States Constitution provides Congress with the power to preempt state law. See U.S. Const. art. VI, cl. 2. The Supreme Court has instructed federal courts that the historic police powers of the states are not to be superceded by federal law unless “that was the clear and manifest purpose of Congress.” Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947). In Louisiana Public Service Commission v. FCC, 476 U.S. 355, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986), the Supreme Court detailed the circumstances when a finding of preemption is appropriate:
“ ‘ “Preemption occurs when Congress, in enacting a federal statute, expresses a clear intent to preempt state law, when there is outright or actual conflict between federal and state law, where compliance with *1282 both federal and state law is in effect physically impossible, where there is implicit in federal law a barrier to state regulation, where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the states to supplement federal law, or where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress. Preemption may result not only from action taken by Congress itself; a federal agency acting within the scope of its congressionally delegated authority may preempt state regulation.”
“ ‘476 U.S. at 368-69, 106 S.Ct. 1890 (citations omitted). In any case, “[t]he critical question is whether Congress intended that federal regulations supersede state law.” Id. at 369, 106 S.Ct. 1890.’
“205 F.3d at 859.”
853 So.2d at 174.
Section 301 of the Copyright Act provides:
“(a) On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.”
Thus, a state law will be preempted by the Copyright Act if (1) the work at issue falls under the subject matter of copyright found in §§ 102 and 103 of the Copyright Act; and (2) the state right is equivalent to the exclusive right within the scope of copyright found in 17 U.S.C. § 106. See also Bush v. Laggo Props., L.L.C., 784 So.2d 1063, 1065 (Ala.Civ.App.2000) (“Thus, § 301 sets forth a two-pronged test to determine whether the Copyright Act preempts state law. First, the work at issue must be within the subject matter of copyright, and second, the state cause of action must be equivalent to the rights available under the Copyright Act. 17 U.S.C. § 301”).
The subject matter contemplated by § 13A-8-81(a)(3) falls under the subject matter of the Copyright Act. Section 102 states:
“(a) Copyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. Works of authorship include the following categories:
[[Image here]]
“(2) musical works, including any accompanying words;
[[Image here]]
“(6) motion pictures and other audiovisual works;
“(7) sound recordings;
[[Image here]]
Clearly, the DVDs and CDs found in Powell’s vehicle fall under one of the definitions found in § 102. Thus, the only real inquiry necessary for this issue is whether § 13A-8-81 (a)(3) creates a right equivalent to a right within the scope of copyright under § 106.
Section 106 states:
*1283 “Subject to sections 107 through 122, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:
“(1) to reproduce the copyrighted work in copies or phonorecords;
“(2) to prepare derivative works based upon the copyrighted work;
“(3) to distribute copies or phonorec-ords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;
“(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;
“(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and “(6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.”
Nimmer on Copyright discusses the interplay between state rights that approach a copyright and § 106:
“[T]he reference to Section 106 in the phrase found in Section 301 — ‘equivalent to any of the exclusive rights within the general scope of copyright as specified by Section 106’ — should be construed by way of identification and not limitation. Accordingly, if a state-created right is ‘within the general scope of copyright,’ it is subject to pre-emption, even if the precise contours of the right differ from any of those conferred by Section 106.
“Still, Section 106 may be said to identify the general nature of the rights that fall ‘within the general scope of copyright.’ Such a right must inhere in a work of authorship. It consists of a right to prohibit reproduction — whether in copies or phonorecords and whether in original or derivative form — performance, distribution, or display of such work. Thus, in essence, a right that is ‘equivalent to copyright’ is one that is infringed by the mere act of reproduction, performance, distribution, or display. The fact that the state-created right is either broader or narrower than its federal counterpart will not save it from pre-emption....
“Abstracting to the realm of principle, if under state law the act of reproduction, performance, distribution, or display, no matter whether the law includes all such acts or only some, will in itself infringe the state-created right, then such a right is pre-empted. But if qualitatively other elements are required, instead of, or in addition to, the acts of reproduction, performance, distribution, or display, in order to constitute a state-created cause of action, then the right does not lie ‘within the general scope of copyright,’ and there is no pre-emption. Thus, the ‘extra element’ test generally furnishes the cornerstone here.”
1 Nimmer on Copyright, § 1.01[B][1] (emphasis in original; footnotes omitted). See also 1 Nimmer on Copyright, § 1.01[B][l][k] (“Pre-emption applies whether the subject state law is civil or criminal in nature.”).
As discussed in Part I.A., an individual commits the offense of “unlawful transport” under § 13A-8-81 (a)(3) if he (a) transports (b) any article containing sounds or performances (c) with the knowledge (d) that the sounds or performances were transferred without consent of the owner. If the offense of unlawful transport of an article containing sounds *1284 or performances transferred without consent of the owner under § 13A-8-81(a)(3) is to survive preemption by § 301, we must determine whether “unlawful transport” is equivalent to copyright in the form of reproduction, performance, distribution, or display. If so, we must also determine whether § 13A-8-81(a)(3) requires an element in addition to, or in place of, the act of reproduction, performance, distribution, or display.
Initially, we note that the “knowledge” element of § 13A-8-81(a)(3) alone does not satisfy the extra-element test. In Crow v. Wainwright, 720 F.2d 1224 (11th Cir.1983), the United States Court of Appeals for the Eleventh Circuit explained:
“The proper method of analysis is to examine whether the elements of a cause of action for the tort of copyright infringement are equivalent to the elements of the crime of dealing in stolen property as it applies in this case. See 1 Nimmer on Copyright, § 1.01[b]. Despite the name given the offense, the elements essential to establish a violation of the Florida statute in this case correspond almost exactly to those of the tort of copyright infringement. The state criminal statute differs only in that it requires the prosecution to establish scienter, which is not an element of an infringement claim, on the part of the defendant. This distinction alone does not render the elements of the crime different in a meaningful way. Section 506 of the Copyright Act, which sets forth criminal penalties for copyright infringement, also requires the prosecution to prove scienter as an element of the case. See United States v. Smith, 686 F.2d 234 (5th Cir.1982). The additional element of scienter traditionally necessary to establish a criminal case merely narrows the applicability of the statute. The prohibited act — wrongfully distributing , a copyrighted work — remains the same. See Harper & Row [v. Nation Enters.], 501 F.Supp. [848, 853-54 (S.D.N.Y.1980)] (‘additional elements of “knowledge” and “intent” required under state law do not afford ... rights ... “different in kind” from those protected by the copyright laws’).”
720 F.2d at 1226-27. See also 1 Nimmer on Copyright § 1.01[B][l](“[T]he mere fact that a state law requires scienter as a condition to liability, whereas the Copyright Act does not, cannot save the state law from pre-emption.”) (emphasis in original; footnotes omitted). Thus, our preemption inquiry must focus on the element of “transport.”
In Part I.A., we observed that “transport” is defined, in relevant part, as “to transfer or convey from one place to another.” Merriam-Webster’s Collegiate Dictionary 1330 (11th ed.2003). Therefore, the act of “transferring or conveying from one place to another” an article containing sounds transferred without the consent of the owner is prohibited by § 13A-8-81(a)(3). Although it approaches a right equivalent to copyright, it appears that the “transport” of these articles is a distinct enough act to save § 13A-8-81(a)(3) from preemption. The act of “transport” most closely approaches the copyright of “distribution.” Section 106 describes this copyright as the right “to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending.” However, the two acts are sufficiently distinct. “Transport” is literally the relocation of the articles, while “distribution” would be the dissemination of the articles through sale or some other form of transfer. In essence, “transport” is merely the mobile possession of these articles. Accordingly, “transport” does not appear to be an act that is equivalent to one of copyright.
*1285 To look at this question from another angle, we can ask whether civil or criminal liability under the Copyright Act would attach to unlawful transport pursuant to § 13A-8-81 (a)(3). Generally speaking, there are two elements one must prove in a copyright-infringement action: (1) ownership of the copyright by the plaintiff; and (2) copying by the defendant. See 4 Nimmer on Copyright § 13.01. See also § 13.01 n. 4 (explaining that “copying” most likely refers to copying, public distribution, or public display). As discussed above, “transport” is not action equivalent to the copyright of copying, distribution, or public display. Furthermore, the act of unlawful transport would not incur criminal liability under the Copyright Act as well. Section § 506 states:
“(a) Criminal infringement.—
“(1) In general. — Any person who willfully infringes a copyright shall be punished as provided under section 2319 of title 18, if the infringement was committed—
“(A) for purposes of commercial advantage or private financial gain;
“(B) by the reproduction or distribution, including by electronic means, during any 180-day period, of 1 or more copies or phonorecords of 1 or more copyrighted works, which have a total retail value of more than $1,000; or
“(C) by the distribution of a work being prepared for commercial distribution, by making it available on a computer network accessible to members of the public, if such person knew or should have known that the work was intended for commercial distribution.”
Again, it is clear that the act of transport is not equivalent to the act of reproduction or distribution, acts necessary to prove criminal infringement.
Through § 13A-8-81(a)(3), in the context of transport, the State of Alabama has created a cause of action that is not contemplated by the Copyright Act nor equivalent to one of the rights described in § 106. Therefore, § 301 does not require the preemption of § 13A-8-81(a)(3). Accordingly, the trial court did not err in concluding that § 13A-8-81 (a)(3) withstood Powell’s claim of preemption.
III.
Powell also argues the trial court erred by denying his motion for a judgment of acquittal. Specifically, Powell contends that the State failed to present evidence showing that the copyrighted material contained on the DVDs and CDs was transferred without the consent of owner in that James Duff, the representative from the RIAA and MPAA who testified for the State at trial, was not an “owner” under § 13A-8-80 or one “authorized to maintain custody and control over business records reflecting consent” under § 13A-8-81(a)(e).
“ ‘ “ ‘In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution.’ ” Ballenger v. State, 720 So.2d 1033, 1034 (Ala.Crim.App.1998), quoting Faircloth v. State, 471 So.2d 485, 488 (Ala.Crim.App.1984), aff'd, 471 So.2d 493 (Ala.1985). “ ‘The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt.’ ” Nunn v. State, 697 So.2d 497, 498 (Ala.Crim. *1286 App.1997), quoting O’Neal v. State, 602 So.2d 462, 464 (Ala.Crim.App.1992). “ ‘When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit [the case] to the jury, and, in such a case, this court will not disturb the trial court’s decision.’ ” Farrior v. State, 728 So.2d 691, 696 (Ala.Crim.App.1998), quoting Ward v. State, 557 So.2d 848, 850 (Ala.Crim.App.1990). “The role of appellate courts is not to say what the facts are. Our role ... is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury.” Ex parte Bankston, 358 So.2d 1040, 1042 (Ala.1978).
“ ‘ “The trial court’s denial of a motion for judgment of acquittal must be reviewed by determining whether there was legal evidence before the jury at the time the motion was made from which the jury by fair inference could find the defendant guilty. Thomas v. State, 363 So.2d 1020 (Ala.Cr.App.1978). In applying this standard, this court will determine only if legal evidence was presented from which the jury could have found the defendant guilty beyond a reasonable doubt. Willis v. State, 447 So.2d 199 (Ala.Cr.App.1983). When the evidence raises questions of fact for the jury and such evidence, if believed, is sufficient to sustain a conviction, the denial of a motion for judgment of acquittal does not constitute error. McConnell v. State, 429 So.2d 662 (Ala.Cr.App.1983).” ’
“Gavin v. State, 891 So.2d 907, 974 (Ala.Crim.App.2003), quoting Ward v. State, 610 So.2d 1190, 1191 (Ala.Crim.App.1992). See also, Ward v. State, 814 So.2d 899, 908-910 (Ala.Crim.App.2000).
“ ‘ “Circumstantial evidence alone is enough to support a guilty verdict of the most heinous crime, provided the jury believes beyond a reasonable doubt that the accused is guilty.” White v. State, 294 Ala. 265, 272, 314 So.2d 857, cert. denied, 423 U.S. 951, 96 S.Ct. 373, 46 L.Ed.2d 288 (1975). “Circumstantial evidence is in nowise considered inferior evidence and is entitled to the same weight as direct evidence provided it points to the guilt of the accused.” Cochran v. State, 500 So.2d 1161, 1177 (Ala.Cr.App.1984), affirmed in pertinent part, reversed in part on other grounds, Ex parte Cochran, 500 So.2d 1179 (Ala.1985).’ ”
Hollaway v. State, 979 So.2d 839, 843 (Ala.Crim.App.2007).
Section 13A-8-81(a)(3), Ala.Code 1975, provides: “It shall be a felony for any person to ... transport ... any article with the knowledge that the sounds or performances are so transferred without consent of the owner.” As discussed in Part I.A., a person commits the offense of “unlawful transport” under § 13A-8-81(a)(3), if he or she (a) transports (b) any article containing sounds or performances (c) with the knowledge (d) that the sounds or performances were transferred without consent of the owner. Powell does not challenge the sufficiency of the State’s evidence with respect to the first two elements; Powell challenges the State’s evidence only with respect to its alleged lack of evidence tending to show he knew the material contained on the CDs and DVDs was transferred without the consent of the owner.
Section 13A-8-80, Ala.Code 1975, defines “owner” as:
“Unless the context clearly requires otherwise, the term ‘owner,’ as used in this article, shall mean the person who *1287 owns, or has the exclusive license in the United States to reproduce or the exclusive license in the United States to distribute to the public copies of the original fixation of sounds embodied in the master phonograph record, master disc, master tape, master film or other device used for reproducing recorded sounds on phonograph records, discs, tapes, films, videocassettes or other articles now known or later developed on which sound is recorded and from which the transferred sounds are directly or indirectly derived, or the person who owns the rights to record or to authorize the recording of a live performance.”
Additionally, § 13A-8-81(e) states:
“In the absence of a written agreement or operation of law to the contrary, the performer or performers of the live performance shall be presumed to own the rights to record or authorize the recording of the live performance. In any proceeding where a performer’s consent is in issue, a person who is authorized to maintain custody and control over business records reflecting consent shall be considered a proper witness, subject to all rules of evidence relating to competency and admissibility.”
Duff, the representative of the RIAA and the MPAA that testified on behalf of the State, was the only witness who offered testimony regarding the ownership of the copyrights associated with the sound recordings and the audiovisual works contained on the CDs and DVDs seized from Powell’s vehicle. Duff described the MPAA and the RIAA in the following manner:
“[Duff]: The Motion Picture Association of America is a trade group formed by the [motion-picture industry] so the [industry] will not have to respond to situations like this. They hire the Motion Picture Association and its attorneys and its investigators and consultants to make the identification of their discs, teach their classes that are ongoing with law enforcement, and to provide technology. That was done so the president of Paramount Pictures wouldn’t have to come to Oneonta for a trial or the president of Atlantic Records wouldn’t have to come to trial. They formed these trade industry groups, educate the people in those groups, and gave them authority to act upon their behalf within their guidelines.
“[The State]: Would that be true for the Motion Picture Association of America?
“[Duff]: The motion picture and the recording industry.
“[The State]: And the Recording Industry Association of America?
“[Duff]: Right. The recording industry is concerned with the audio [CDs], the music. And the Motion Picture Association is concerned with the actual movies, the [DVDs] and that sort of operation.”
(R. 126-27.) Additionally, outside the presence of the jury, the following discussion took place:
“THE COURT: These two Associations that you are employed by, the Motion Picture Industry and the Recording Industry Association.
“[Duff]: Yes, sir.
“THE COURT: Do either of those associations have ownership or licensing rights to all these [DVDs] or [CDs] that were recovered from Mr. Powell?
“[Duff]: They are not the owners. They act upon—
“THE COURT: Just answer my question. Do they have the ownership rights or licensing rights to the [CDs] or [DVDs] in [the evidence box containing the items seized from Powell’s vehicle]?
*1288 “[Duff]: I don’t think so. That is why they hired the Industry.”
(R. 162-68.)
At the close of the State’s evidence, Powell asked for a judgment of acquittal, and the trial court held a lengthy discussion regarding the motion’s merits:
“[Defense counsel]: Your Honor, at this point, we would like to ask for a directed verdict. I don’t believe the State has made a prima facie case especially in that there has been no testimony at all as to the performers’ consent. There has been no testimony at all as to any representative of the owner of these rights. There has been no testimony at all of anybody who is authorized to maintain custody and control of business records. Nothing in Subsection e of [§ 13A-8-81] where we have been contesting the rights have been laid out or set before the Jury.
“THE COURT: [District Attorney], the reason I asked Mr. Duff those questions outside the presence of the jury, I thought that was what his testimony was — that those two agencies did not have the ownership or licensing or possess them. I think you may have a great case of pirating [CDs] and [DVDs]. As far as the Court is concerned, with respect to that I think that is what is going on. I realize you have your argument. I think we all realize that we have this Statute that he is being prosecuted under and we don’t have any law. With respect to [defense counsel’s] motion, do you have anything to say?
“[District Attorney]: Yes, sir. Your Honor, we beg to differ with learned counsel. We will concede that the statute probably leaves a lot to be desired. We will also concede that the Legislature could do some work on this and make it a little easier to proceed. However, we believe that since this was brought under the provisions of Article 4, [§ 13A]-8-80, which goes to great length as describing who the owner is in very broad and liberal terms. I think the evidence has been clear at this point, at least the weight of the evidence would be clear that Mr. Duff represents the recording industries of America both for the production and distribution and supervision of [CDs] and [DVDs]. Then you go down and you read Subpara-graph 3 which says ‘Manufacture, distribute, transport or wholesale any article with the knowledge that the sounds or performances are so transferred without the consent of the owner.’ Mr. Duff has testified that had the consent of the owner been given, these would not be on [CDRs] or [DVDRs]. There is also evidence that has been put before the jury that this defendant admitted that he was a salesman. That he was in the business of selling these. That he bought them from a fellow by the name of Bread at a Texaco Station and that he was selling them to individuals in the State of Alabama. I believe he said further that he did not sell them to stores. There is enough knowledge imputed here and inferences can be drawn from the evidence that he did know that these were pirated [CDs]. It is obvious they are pirated CDs based upon the testimony of Mr. Duff. And if they are pirated CDs, they are done so without the consent of the owner. That is pretty clear the way I see it. I believe we have made a case and it is now for the Jury to decide whether he is guilty or not. Now maybe if this Jury finds this defendant guilty, then Mr. Goldstein can do some surgical work in the way of appeal on the validity of this statute. If they find him not guilty, then we have had a nice exercise here today dealing with curious statutes at best. We believe that the *1289 evidence has been presented sufficiently to go to the jury as to whether or not this defendant had knowledge at the time he was transporting for the purpose of wholesaling or otherwise these pirated [CDs] in the State of Alabama in violation of this statute.
[[Image here]]
“THE COURT: ... I don’t know that we have had testimony that an owner has come forward and say they didn’t give consent.
“[District Attorney]: The owners, Your Honor, as I understand what Mr. Duff has said, is the Association. They are the Ombudsman or the representative of the owners of these—
“THE COURT: I specifically asked him that and he said ‘no.’
“[District attorney]: No, sir, I don’t believe he said no.
“THE COURT: I asked him if these Associations had the ownership or licensing rights to all of these [CDs] and [DVDs] in the box and he said he didn’t believe so.
“[Assistant district attorney]: The owners of the [CDs] make up the Association. They are members of the Association. He listed off eight members of the Association. They are the Association. They are the ones that own the rights.
“THE COURT: That’s not what he said.
“[Assistant district attorney]: Could we bring him back in and ask him that? On direct examination, that is what his testimony was. He named off eight members.
“THE COURT: I point blank asked him whether or not these two Associations had the ownership and licensing rights to these [CDs] and [DVDs] in the box.
“[Assistant district attorney]: The Association is made up of the owners of the rights. He gave the Jury eight motion picture industries that had [DVDs] in here and they were the companies that make up the Association. They just formed the Association to have one arm to enforce their rights.
“THE COURT: He said the Association doesn’t own the rights.
“[District attorney]: Your Honor, Mr. Duffs testimony was that the Associations are a group of people represented by the Association who have authorized the two Associations to ensure that their property rights — their proprietary rights in this intellectual property is protected. That together with the testimony that he said no one would produce or authorize the use of [CDs] or [DVDs] on a recordable [CD] or a recordable [DVD], That these are clearly pirated tapes and if they are pirated tapes or discs, then they are therefore in violation of the rights of the owners represented by the two Associations. That presents, I think, a valid jury question as to this subsection 3 that he was transporting these for the purpose of wholesaling or some other purpose which was not appropriate under the statute— knowing or having reason to know that these are pirated or unauthorized pieces of intellectual property.
“THE COURT: Anything else, [defense counsel]?
“[Defense counsel]: Yes, Your Honor. First of all, as [the district attorney] answered, he managed to pull from Subsection 2 and 3 — my client is not charged under Subsection 2 or 3. He is not charged with manufacturing and he is not charged with distribution. He is charged with transporting. Definition of owner pulled from 13A-8-80, which says unless ‘the context clearly requires.’ The context clearly requires that we examine section e under 81 because that is the section he is charged *1290 under — under the plain Statute language. It says very directly in the absence of a written agreement — I think we can agree that there is no written agreement. The operation of law is to the contrary. I don’t know of any law that makes an Association to have the exclusive ability to enforce licensing members. The performer or performances or the live performer would be presumed to own the rights to record or authorize. We haven’t heard from any of those people. The person who is authorized to maintain custody and control over business records can testify. We haven’t heard from that person. We do not have any representative here or anybody who we can call and say ‘This person owns the rights.’ I contend, Your Honor, even if we did, I think the testimony came out several times that this is an intellectual property issue or reproduction issue. I will say once again that it is preempted by Title IV of the United States Code and that is specifically reserved into copyrights of Section 301.
“THE COURT: Do you have the specific Code section on that as far as copyrights?
“[Defense counsel]: Yes, Section 301. “THE COURT: Is that sufficient for the record?
[Defense counsel]: It is included in my initial Motion to Dismiss. Your Honor, as far as this case is concerned and this Statute, I don’t believe we have anybody here who represents anyone who actually holds the rights and the assignments. “THE COURT: At this time, I’m going to deny your motion.”
(R. 168-77.)
Initially, we note that § 13A-8-81(e) is not applicable to Powell’s case. Section 13A-8-81(e) applies to live recordings, like those described in § 13 — 8—81 (a)(2). There was no evidence presented that any of the CDs or DVDs seized from Powell’s vehicle were unauthorized recordings of some live performance. Thus, Powell’s argument that Duff was not the authorized custodian of business records reflecting consent is moot.
In Hankins v. State, 989 So.2d 610 (Ala. Crim.App.2007), this Court stated:
“[T]his Court in Carroll v. State, 599 So.2d 1253 (Ala.Crim.App.1992), noted:
“ ‘ “Where, as here, this Court is called upon to construe a statute, the fundamental rule is that the court has a duty to ascertain and effectuate legislative intent expressed in the statute, which may be gleaned from the language used, the reason and necessity for the act, and the purpose sought to be obtained.” Ex parte Holladay, 466 So.2d 956, 960 (Ala.1985). “[T]he fundamental rule of statutory construction is to ascertain and give effect to the intent of the legislature in enacting the statute.... In construing the statute, this Court should gather the intent of the legislature from the language of the statute itself, if possible.... We may also look to the reason and necessity for the statute and the purpose sought to be obtained by enacting the statute.” Pace v. Armstrong World Industries, Inc., 578 So.2d 281, 283 (Ala.1991). “If possible, the intent of the legislature should be gathered from the language of the statute itself. However, if the statute is ambiguous or uncertain, the Court may consider conditions that might arise under the provisions of the statute and examine the results that will flow from giving the language in question one particular meaning rather than another.” Volkswagen of America, Inc. v. Dillard, 579 So.2d 1301, 1305 (Ala.1991).’
*1291 [[Image here]]
“599 So.2d at 1264-65.”
989 So.2d at 616 (emphasis added).
Here, the phrase “unless the context clearly requires otherwise” is rather ambiguous. However, given the factual situation at hand, we can see that this may be a possible situation the legislature could not foresee, but attempted to draft § 13A-8-80 using broad enough language to cover. Duff testified at trial that the RIAA and MPAA are trade organizations that were formed, in part, to represent the interests of the recording industry and movie industry, respectively, in copyright litigation across the country. Duff explained that his role was to represent the interests of the various member studios so that the studios would not have to send a representative to every forum in which a copyright-related case could arise. Thus, the context in this situation involves copyright holders utilizing representatives from their respective trade organizations to represent their rights at trial. We do not believe § 13A-8-80 should be read to require each copyright holder — generally, the record label or movie studio — to testify at every criminal proceeding in Alabama.
Duff was a competent witness who can be construed as an “owner” of the rights discussed in § 13A-8-80. Therefore, the State presented sufficient evidence that the recordings contained on the CDs and DVDs recovered from Powell’s vehicle were transferred without the consent of the rightful owner. Duff testified that the CDs and DVDs were not made pursuant to industry standards in that they were “burned” onto a disc as opposed to being “pressed” into the disc. Additionally, none of the CDs or DVDs were packaged in a manner consistent with the industry practice, and no CD or DVD was accompanied by the artwork or information generally associated with typical commercial reproduction. Moreover, although Powell was not charged with any offense associated with the sale of the CDs or DVDs, the State presented evidence indicating that Powell was, in fact, involved with the buying and selling of these reproductions. Duff also testified that any commercial activity on Powell’s part was not authorized by the copyright holders. It would be fair for the jury to infer that Powell’s commercial activity, or intent to engage in commercial activity, evidenced that he was operating without the consent of the owners. Furthermore, taken as a whole, the evidence gave rise to the inference that Powell was operating with the knowledge that his activities were taking place without the consent of the owners. Thus, it is apparent that the State presented ample evidence upon which the jury could have found that the State proved each and every element of § 13A-8-81(a)(3). Accordingly, the trial court did not err in denying Powell’s motion for a judgment of acquittal.
Based on the foregoing, the judgment of the trial court is due to be, and is hereby, affirmed.
AFFIRMED.
WELCH, P.J., and WINDOM, BURKE, and JOINER, JJ., concur.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. Powell conceded that the CDs and DVDs recovered from his vehicle were not “pressed.”